## Kleppin & Associates, L.L.C.
### Forensic & Psychological Counseling & Consultation
701 Devonshire Drive, Suite 201
Champaign, Illinois 61820
MKleppin92101@yahoo.com

## SEXUAL OFFENDER EVALUATION and RISK ASSESSMENT

### Identifying Information:

**Interviewee's Name:** Eric Ingram

**Address:** 504 Hillcrest

Washington, Illinois, 61571

**Location of Assessment:** Peoria County Jail

**Referral Source:** Mr. Ingram's attorney, Mr. Charles Schierer

**Date of Assessment:** 06-15-19

**D.O.B.:** 02-14-88

**Phone:** N/A

**Evaluator:** Michael Kleppin

### Identifying Information and Reason for Referral

Mr. Eric Ingram is a 31-year-old Caucasian male who is currently being detained at the Peoria County Jail, in Federal Custody since his arrest in late 2018. Prior to his arrest he reports his address as having been 504 Hillcrest which is located in Washington, Illinois and were he resided in his grandparent's home for the thirty-one years of his life, living most recently with his grandmother.

Mr. Ingram was referred for a sexual offender evaluation and risk assessment through his personal defense attorney, Mr. Charles Schierer, and the Federal Judicial System, having been charged with count one: Sexual Exploitation of a Child and count two: Possession of Child Pornography. By Mr. Ingram's description he has tendered a plea of guilty to Possession of Child Pornography and is awaiting Federal Sentencing. This evaluation occurred in a contact room provided by the staff at the Peoria County Jail, located in Peoria, Illinois.

The following evaluation is not intended to determine or assess any guilt or innocence on the interviewee's part. Instead it is to assess prior developmental, psychological and substance use histories, sexual interests/deviances and potential risk factors in comparison to those of other sexually deviant, aggressive and/or offending individuals as it relates to over all potential risk.

### Informed Assent, Consent and Limitations of Confidentiality

Prior to this assessment it was explained this interview was a portion of a comprehensive evaluation and did not constitute a therapist – client relationship. Furthermore, it was stated the information gathered during the interview its findings, impressions and recommendations would be summarized and placed into a report, which would be forwarded to his attorney and in addition to the Federal

Court Services. Mr. Ingram stated he understood this, signed an "Informed Assent/Consent" form and agreed to continue with the session.

## Procedures

Structured Sex Offender Specific Clinical Interview
OMNI-IV Personality Inventory
The Hare Psychopathy Checklist-Revised
Beck Depression Inventory
Burns Anxiety Inventory
Michigan Alcoholism Screening Test
Bumby Cognitive Distortions Scale
The Internet Sex Screening Test (ISST)
The Sexual Violence Risk Coding Sheet
The STABLE 2007 Scoring Sheet
Post-Interview review of the documentation made available by his attorney, Mr. Charles Schierer, including (yet not limited to):
- Washington Police Department Report, dated; 9-11-18
- Washington Police Department Supplemental Report, dated; 10-07-18
- National Center for Missing and Exploited Children Report, dated; 08-02-18
- Internet Crimes Against Children (ICAC) Data System Report, dated; 09-11-18

## Social History

Mr. Ingram disclosed having been born in Peoria and states he has been raised in Washington, Illinois where he disclosed having lived throughout the duration of his life to this point. In speaking of his parentage, Eric sates his biological parents have never been married and describes his relationships with both as minimalistic at best. Elaborating, Mr. Ingram described his biological father as an alcoholic who was also abusive. By his report, Eric has no significant relationship with him, stating he knows who he is and how they have had occasional contact, however by his description this is superficial at best and nothing of significance to him. As with his biological father, Mr. Ingram states his relationship with his mother is, "non-existent" and relayed how the two have not spoken in five or six years. Reflecting back, Mr. Ingram described how his mother had placed him for adoption when he was approximately two years of age and then moved out of state to Colorado. By his recollection, he had no contact with her for the first part of his childhood, until she had moved back in the area when he was in middle school and then, again only occasionally.

Continuing on with his recollections of his childhood, Eric disclosed how his maternal grandmother and her husband had taken over temporary custody of him when his mother put him up for adoption. Discussing his relationship with his grandmother in greater detail, Mr. Ingram indicated feeling as though the two have a "great" relationship, further characterizing it by claiming "she is my best friend" and how she has been the primary caretaker in his life. As such, he described her as being present in his life both physically and emotionally where she engaged as a supportive, caring and loving parent. In addition to his maternal grandmother, Mr. Ingram spoke of his step-grandfather whom he states he had a good relationship with throughout his childhood as well. Commenting further he recalled his step-grandfather, who passed away when Eric was approximately twenty years

of age, as being a loving and supportive individual as well and indicated feeling he had a "wonderful" relationship with and for which he disclosed being grateful for. Reflecting on his loss, Mr. Ingram relayed how his death was due to an aortic aneurism and tearfully disclosed how this loss was a profound one which he does not believe he has totally dealt with.

Continuing along in his commentary, Mr. Ingram disclosed being the oldest in the birth-line, stating he has one half-sister with whom he shares his biological mother, and another half-sister and three half-brothers whom he shares his biological father. Offering more detail about his siblings, Eric states his mother's daughter is twenty-eight, with his other siblings being eighteen, sixteen, fourteen years of age with the youngest sibling being his father's twelve-year-old daughter. Discussing his relationships with his siblings more thoroughly, Mr. Ingram indicated feeling as though there really hasn't been much of a relationship with any of his siblings, although he did mention having attempted to engage with the oldest while growing up but found this to be a fruitless attempt for the most part, depicting this as something which was "on and off". As a result, he feels as though he does not have much of a relationship with any of his siblings, especially his father's children.

When asked about other extended family, Mr. Ingram relayed how his maternal grandfather lives in his home area but feels he does not have much of a relationship with him. In other disclosures, Eric relayed how he has aunts and uncles on both sides of his family whom he has engaged in activities with however beyond this indicates no other significant family connections.

Discussing his family as a unit, Mr. Ingram indicated feeling as though it was traditional in its function, despite being raised by his grandparents and recalled the home as one where there was structure provided. Reflecting further, Eric recalled how there were chores to do at home as well as school work and how he and his grandparents did activities and functions together such as dinners, outings, trips and vacations during his youth. Contemplating his youth in greater detail, Mr. Ingram indicated feeling as though he met his childhood developmental milestones on time and without difficulties and denied any history of bedwetting, being destructive or aggressive with his toys and replied in the negative when asked if he had ever engaged in behaviors such as fire starting or being cruel to animals. When asked, Eric described himself as a good youth who was rule abiding for the most part however remembered times in which he tested limits or pressed his boundaries, however again felt as though this was "normal" adolescent rebellious behavior and nothing delinquent or malicious. Questioned further, he recalled how on those occasions when he would infract a rule, it would usually be something minor and how his grandparents would "ground" him or remove privileges as a means to redirect his behavior.

Continuing to elaborate on the events of his youth, Mr. Ingram reiterated how his father was physically abusive to him, recalling how his father punched him in the face on one occasions when he was nine or ten years of age. In addition to this, Eric described his relationship with his mother as having endured mental or emotional abuse, citing the situation in general, along with her multiple geographic relocations as being troubling to him during his youth. Additionally, Mr. Ingram spoke of the violence he witnessed with his father being physically aggressive with others, as well as his drinking, which he claims he feels contributed to the chaos and maladaptive childhood he experienced.

Turning his attention to his social connectivity as a youth, Mr. Ingram described himself as a youth who was "never socially awkward" and recalled having various friendships. In addition to this he relayed having been in various activities as youth ranging from weekly church attendance and involvement with the church youth group to being a Boy Scout, where he ultimately attained the level of Eagle Scout. In other descriptions of his peer relationships and activities Eric remembered hanging out and engaging in age appropriate activities and functions. Into the present day Mr. Ingram states he had some peer relationships and disclosed his "best friend" being one of his cousins whom he had remained in contact with and have weekly interactions. Additionally, he states he had started to reconnect with other peers from his earlier years however with his most recent circumstance (i.e. jail, criminal charges, etc.) he feels he has become more isolated at this point with the exception of a few.

As a student, Eric states he entered into the education system on time with his peer cohort, remembering having been within the same school system throughout his scholastic career and stating he was diagnosed with Attention Deficit Disorder in his youth and how this created difficulties for him in reading. Reflecting back on his academics further he remembered being held back in the second grade due to the "chaos" he was experiencing at home and indicated feeling as though he was "not a good student." As a result, Eric states he hated school and found himself struggling academically, yet when questioned further he relayed feeling as though he was well liked amongst his peers and teachers, stating his teachers would describe him as friendly and would have been happy to see him seek a career. When asked, he recalled having received detentions for minor infractions but denied any serious behaviors or troubles which may have resulted in him receiving suspensions or being expelled. Continuing along in his descriptions of his years in high school, Eric reiterated his dislike for school due to the various difficulties he faced and by his recollection he dropped out of school in between his junior and senior year, stating he was too far behind in credits at the time to a point where he had only achieved a sophomore status. When asked, Eric disclosed having later obtained his General Education Degree in 2010.

Continuing on in his descriptions, Mr. Ingram relayed how he continued to live at home after leaving high school and entered into the workforce. Reflecting back on this he remembered having various entry level jobs and states at the age of twenty-one he made the decision to venture to Nashville where he entered into a school where he began a pursuit as an Automotive Technician in diesel engines. By his recollection he remained at this school for approximately seven or eight months before leaving and returning to his home in Washington, Illinois after his grandfather has passed away. Upon doing this Eric describes having entered into the emergency response profession where he became an EMT.

In other commentaries, Mr. Ingram denied having ever been married at any time in his life and went onto relay his belief of having never been in any significant, or serious relationships, claiming he "never really pursued" these. Elaborating on this he described feeling as though he spent a good portion of his twenties "trying to find" himself and was concerned of becoming like his father in various ways, including his relationships. Questioned further, Eric went onto acknowledge having intimate relationships in his history and described one of these as being with the woman who is the mother of his child. Providing detail about this relationship, Eric remembered how the two met through a mutual friend and feeling as though their friendship and mutual liking for one another developed into a sexual relationship. Discussing this in greater detail, Mr. Ingram spoke of how she

is three years his junior and characterized the relationship as a "friends with benefits" type of relationship. By his recollection the couple eventually became pregnant and now share a daughter. Commenting further, Eric states the two are no longer "together" but get along fairly well as friends and as co-parents.

Continuing along in this area of discussions, Mr. Ingram recalled other "similar" relationships in his history, claiming to have had between six to eight such relationships and estimated the longest of these to have lasted approximately six months in total. Reflecting further, Eric indicated feeling as though he has never had time for a significant relationship due to being selfish with his time.

Discussing his daughter, Mr. Ingram disclosed how she is six years of age and lives with her mother but had regular visitations with him. Elaborating, Eric characterized her by stating she "is my little buddy" and recalled how the two did various activities together such as going to the park, going fishing or going to the movies together. By his description she would visit him on the weekends as well as get together on various evenings for dinners. When asked, Eric disclosed feeling as though he has been a good parent, describing himself as a father who takes the time to be with his daughter and believes himself to be both physically and emotionally available to her as a supportive parent. Summarizing his parenting skills further, he indicated feeling as though he tries to parent his daughter the way his grandparents raised him, again commenting on how his fear of being like his father is something which he thinks about often. Questioned about his disciplinary practices, Mr. Ingram states he makes use of talking to his daughter as well as utilizing loss of privileges in order to encourage behavioral redirection and when specifically questioned, he adamantly denied any abuse of her, either physically, mentally, emotionally or sexually. Offering additional feedback on this he states he has never been accused of such activities and has never been investigated by the Department of Children and Family Services or any other child welfare agency or legal authority. In closing commentary related to the current status of his relationship with his daughter, Mr. Ingram disclosed how he has sent letters to his daughter but has had no response or other contact with her or her mother at this time. Elaborating on this Eric indicated feeling as though this is related to his current circumstance and their possible worries or concerns, which he states he understands.

In other areas of his life, Mr. Ingram denied any history of being involved with any branch of the United States Military, however he had considered the United States Navy until a blood condition prohibited him from enlisting. He went onto disclose feeling as though he is isolated at this point in his life and identifies his grandmother as his primary contact with the world. In addition to his grandmother, Eric states his friend, a cousin of his, and his friend's wife continue to be supportive and how he is thankful for this. He went onto state his hobbies and interests include wood working, building furniture and gardening as well as working on small engines. Other activities he engages in and enjoys includes fishing, hiking, biking and learning "new things." Summarizing his life to this point, Mr. Ingram indicated feeling as though he has squandered several years "trying to figure out" who he was. However, by his reports once his daughter came into his life this changed and he states he became more focused and began to settle into a career and a path in his life.

## Criminal Background and Legal History

In discussing his criminal history, Mr. Ingram denied any involvement with the juvenile justice system, replying in the negative when asked if he had ever been arrested or adjudicated for any form

of juvenile delinquency as an adolescent. Continuing along in his commentary, Mr. Ingram states his first interaction with the criminal justice system occurred in 2011, at the age of twenty-three when he was convicted of a Driving Under the Influence in Tazewell County. Elaborating on this he states he was placed on supervision, which he claims to have successfully completed, along with completing substance abuse/DUI classes. Remembering this in some detail, Eric states he was evaluated and recommended to attend one therapy session, which he reports having done and then was discharged successfully. Beyond this he reports the only other entanglement with the adult criminal justice system has been his current criminal charges within the Federal Courts.

In other discussions, Mr. Ingram replied in the negative when asked if he had any other involvement with any other criminal courts from other counties, states or jurisdiction and denied having served any term of detention or incarceration within any county, state or federal correctional facility. In addition to this he states he has never been placed on any form of court supervision, probation, parole, mandatory supervised release or conditional release in the past. Finally, when asked, Eric denied any other sexually motivated crimes (contact or non-contact), either alleged, charged or convicted.

### Index Offense and Events Leading to Arrest

In speaking of the events leading to his arrest, Mr. Ingram reiterated how he has been charged with Sexual Exploitation of a Child and Possession of Child Pornography. Describing the charge of exploitation, Mr. Ingram disclosed this as involving one fifteen-year-old female victim who was known to him as the sister of his best friend's girlfriend. Elaborating, Eric states he met the victim approximately seven years ago after his best friend had come back from the military however claims he and she began communicating with each other approximately one year ago. Mr. Ingram states this began while his best friend had been living with him for a period of time and during this period his best friend's girlfriend would come over and visit, occasionally bringing her younger sister. By his recollection the two would engage in behavior which he began viewing as flirtatious (i.e. she would take his hat, be talkative, etc.) and as a result, he now identifies how "barriers went down." Upon additional recollections, Mr. Ingram described how the two began messaging each other, claiming she engaged in reaching out to him first, and states the conversations started out from being something akin to "big brother" talks to conversations which contained sexual discussions. As a result, he now identifies how he began to view the adolescent as "a woman and not a teenager" where he found himself becoming involved in inappropriate behavior.

In discussing the above mentioned behavior, Mr. Ingram disclosed how the two engaged in trading pictures of each other and recalled receiving images of the victim engaging in self-stimulation and/or masturbatory activities on three to four occasions by his account. When asked, he states he is the party responsible for suggesting this. Additionally, he states he would send images of himself with his shirt off but denied any images of himself masturbating having been sent. Discussing this further he claims the victim had initially sent images which he states were, "suggestive" however it was he who took it "further" and made the suggestions which were outlined in the accusations. Commenting further, Eric described other images which included the victim placing objects (i.e. her fingers, handle of hair brush, etc.) into her vagina. Questioned more specifically, Mr. Ingram admits to having masturbated on at least one or two occasions while watching the victim however denied having ever shown/exposed himself to the victim while doing this. Continuing along in his

disclosures, Eric claims this activity continued for approximately two weeks and spoke of how he made use of his cellular telephone and personal tablet to access the internet to view.

Describing how his activities were discovered, Eric indicated being aware of how administrators with the social media outlet known as FaceBook identified the exchanges between the two and notified the Federal Authorities. Reflecting further, Mr. Ingram disclosed feelings of guilt, shame and remorse over his activities, claiming he realizes the immorality of his behaviors and how ethically wrong he was. Commenting further, he described feeling ashamed of possibly having taken away the victim's "innocence" and stated he had worried about the ramifications this may have on her in the future.

## Relationships and Sexual Behaviors

Mr. Ingram disclosed his sexual orientation as being heterosexual, reporting he has been aware of his attraction to the opposite sex since an early age and states he is comfortable with this. He recalled entering into the ritual of dating when he was fifteen years of age and states this occurred with a female classmate who was his approximate age or younger by one year. When asked what he felt were the characteristics of dating, Eric disclosed feeling as though this occurred when a couple were committed to each other, going out and doing various activities with one another but not something which may have become intimate or sexual at this point. Discussing his opinions of what characterized a "serious" relationship he went onto indicate feeling this would occur when a couple were becoming more intimate and exploring the possibility of a future together.

Continuing along in conversation, Mr. Ingram disclosed having become sexually active when he was fifteen or sixteen years of age and again described this as being with a female schoolmate at the time who was his same approximate age or younger by one year. Since becoming sexually active, Eric estimates having had thirteen or fourteen sexual partners in his past, stating all were females who were around his same approximate age at the time he was sexually active with them. Commenting further on his sexual experiences, Mr. Ingram disclosed the longest period of time between meeting a prospective partner and having sex with them as being three or four months while the shortest period of time between meeting someone and having sex with them was estimated by him to be approximately five hours.

Discussing his sexual practices more thoroughly Mr. Ingram admits to having engaged in vaginal intercourse in the past as well as having received fellatio from a female partner as well as having participated in offering cunnilingus to a female, however he denied having ever engaged in any act of fellatio with a male and went onto reply in the negative when asked if he had ever engaged in any form of anal sexual gratification with either male or female partners. Eric went onto describe how he has participated in using sexual objects/instruments/toys with a female partner in the past but states he has never done anything such as this for solitary sexual gratification. Commenting further on his sexual encounters Eric replied in the negative when asked if he had ever engaged in any extra-marital affairs and went onto adamantly deny any same gender sexual experiences. Upon additional disclosures, Mr. Ingram states he has never engaged in any sexual activity with multiple partners, group or orgiastic sex in his history but went onto reply in the affirmative when asked if he had ever engaged in a "one-night stand" scenario, stating he had done this once while living in Nashville. In additional disclosures Eric replied in the negative when asked if he had ever employed a prostitute or escort service for sexual gratification, or had ever entered into a strip-club or similar establishment.

Exploring paraphilic behaviors, Mr. Ingram denies having ever exposed himself in public (exhibitionism), having participated in acts of voyeurism (peeping) or of having ever engaging in frottage (sexually fondling an unsuspecting individual). Additionally, he states he does not have any fetishism by his self-assessment and denied having ever engaged in any behavior(s) such as sexual cross-dressing, bondage, sexual role playing or making the use of violence (real or simulated) for sexual stimulation or arousal enhancement. In other disclosures he acknowledged having engaged in similar activities with adult females as the actions/behaviors for which he has been criminally charged and described how he and other females he was consensually sexual with would engage in activities via the internet. However, he denied having ever employed any animal in his sexual practices (bestiality/zoophilia). Finally, when directly asked Mr. Ingram denied having any sexual arousal or attraction to children (pedophilia) and went onto reply in the negative when asked if he felt children were mature enough to engage in sexual activity or if he felt them to be sexual objects, reiterating how he identifies himself as the adult who "should have known better" in his current circumstance.

Continuing along in conversation, Mr. Ingram states he first viewed pornography when he was eighteen years of age and states since his initiation to such materials he has viewed only through the medium of electronic devices such as a cellular telephone and/or computers through which he was capable of accessing the internet. Commenting in greater detail, Eric estimates the ages of the individuals in the images he has viewed to be eighteen or older, with the exception of the victim in his current (Index) offense, and adamantly denied having viewed any images which may have included minors or which could be considered as child pornography. When asked, he states he prefers images including naked females, but has viewed images which have also included males, usually while engaging in sexual activities, and/or copulation with females. He went onto deny any active use of fetishistic pornography and reiterated his preference to be images which involved sexual intercourse and states this would include female on male images as well as female on female images. Questioned further, he recalled his initial viewing practices to be something he engaged in on a nightly basis and at one point seemed to peek by his recollection to three times per day but claims this only lasted for a few months before decreasing to something he states occurs approximately twice a week at this point. Continuing along in the conversation he acknowledged having produced images through the use of personal technology, as well as having solicited such images and admits to having masturbated while viewing pornography, both amateur and professionally produced images.

Detailing his masturbatory practices, Eric recalls having first experienced manual stimulation when he was twelve or thirteen years of age and described this as occurring through the process of natural discovery after learning about it in sexual education at school. Thinking back on his practices, Eric states his initial use of manual stimulation was something he was doing as often as possible, stating he would masturbate as much as six times per day when he first became aware of the activity. He went onto relay feeling as though this was at the zenith of his masturbatory practice and how into his adult years this diminished to something he now only does once per day and describes this as mostly a pre-bedtime ritual. When asked, he states he makes use of mental imagery or fantasies which involve the pornography he has viewed in the past. He went onto deny any thoughts or fantasies which involve children or activities which include force, aggression or other inappropriate or disturbing imagery.

In closing summaries, Mr. Ingram reiterated having involved himself in similar activities as in his current criminal case, but claims this was with females who were of legal age for consent. He also relayed having made use of various dating websites or applications through which he has engaged in contact with others.

## Vocational

Mr. Ingram reports he is currently unemployed, having lost his job due to his current incarceration and described his most recent employment as occurring at Diversified Mechanical, where he states he worked for three years in heating and air conditioning. When asked, he states he loved the work he was doing and prior to this location he had worked a year at another location in a similar position. Other work he states he has had in the past includes eight months of employment at Keystone where he was employed through a temporary agency. Eric went onto disclose feeling as though his work ethic is very strong and he denied having ever been terminated from a position for any reason. Speaking further, he denied having ever stolen from a place of employment, states he has never made use of alcohol or drugs while at work and has never been accused of any form of workplace violence or sexual harassment.

## Physical Health and Medical

Mr. Ingram reports his physical health as being good despite the issue with his blood (Idiopathic Thrombocytopenic Purpura) which he had previously mentioned. When asked, he states he has had his spleen removed due to his I.T.P., stating this was during his adolescent years, but other than this feels he is in good health and denied any other history of surgeries, hospitalizations or illnesses.

## Psychiatric/Psychological and Substance Use/Abuse History

Mr. Ingram was dressed in a grey and white striped uniform provided by the staff for residents at the Peoria County Jail, was observed to be groomed appropriately, well kempt and hygienically clean in his appearance. He presented as being polite, respectful and cooperative throughout the session and his affect appeared appropriately animated to his surroundings and circumstance, where he demonstrated a range of emotion varying between being smiling and bright to contemplative and tearful. During the session he sat upright in what appeared to be a relaxed body posture, made good use of eye and voice contact and appeared engaging in the conversations which were occurring. In speaking of his offending behavior, he appeared to present as being liable for the circumstances as well as accountable for the actions which led to his offense. On occasion he seemed to make use of some cognitive distortions which are commonly observed in offending populations, however his sense of accountability and realization of his offending behavior was evident as was a presence of feelings such as guilt, shame and regret. In speaking of his actions and the potential consequence, Mr. Ingram also appeared to identify how his actions may impair the victim (i.e. victim empathy) and her possible future. Throughout the interview process he appeared to be congruent and fluid in his thought process, in control of his faculties and seemed to be oriented to person, place and time.

In discussing his psychological health, Eric reiterated having been diagnosed with Attention Deficit Disorder as a youth and states the only counseling he can recall having participated in was while in high school for developing coping strategies for this. He went onto deny any other diagnosis to his

knowledge and states he has never had any other therapeutic counseling experience. In speaking of his current mental health, Mr. Ingram denied any current difficulties, problems or other issues which may be symptomatic of any psychological concerns or diagnoses. To the contrary he described himself as being a "fairly upbeat" individual who is trying to remain optimistic despite his current circumstance. When questioned more specifically he adamantly denied having any symptoms which might suggest issues with anxiety, depression or any other mood disturbance nor did he seem to present with any diagnostic criterion which would suggest any issues with any form of mania, schizophrenia or any other psychotic disorder. Furthermore, he adamantly denied any history of suicidal ideation or urges to harm himself and states he is not currently suicidal.

In speaking of his current mental health, Mr. Ingram disclosed feeling as though his sense of self-esteem is good, although he admits to this being slightly lower than before his arrest, and indicated feeling as though he was a good individual. He described his emotional self-regulation as something which he may have struggled with in his youth, stating he would "explode" when angry, but states this improved as he grew older and developed better coping skills. Reflecting on his current expression strategies, Eric states he makes use of walking away, being constructive with things and "refocusing" himself. Eric went onto state he has never engaged in any vandalistic activities or in the destruction of property, and has no history of physical altercations with others or of having used a weapon against someone. Mr. Ingram went onto state he was in possession of an FOID however states he does not have any access to firearms at this time, describing how his uncle is now in possession of his firearms. Finally, when asked he states there is no family history of mental health issues to the best of his knowledge.

In exploring for potential sexual disorders and/or paraphilic behaviors, Mr. Ingram's disclosures discussing his sexual interests, urges and practices do not seem to suggest potential difficulties in "hypersexuality" (Stein, Black, Shapira & Spitzer, 2001, Kalfka, 2003, Langstom & Hanson, 2006, and etc.) at this time nor do they seem consistent with any current specific diagnosable paraphilic sexual disorder. This does not rule out the potential danger or consequence(s) related to any of the offending behaviors outlined in the documentation, but simply suggests the probability of the behaviors generating from a different etiology other than a specific psychological or paraphilic disorder at this time, such as underdeveloped relationship development skills, poor boundaries, immature understanding of sexually intimate relationships and etc.

In discussing his usage of mood altering drugs Eric reports having first been initiated to alcohol when he was seventeen or eighteen years of age and characterized his use as "social use" despite having received a DUI while in his early twenties. He went onto state his consumption of the beverage is usually in the form of distilled alcohol and claims his last use to have been in September of 2018. In speaking of his using frequency, Mr. Ingram claims he would drink mostly on the weekends, during social functions or activities and indicated being uncertain as to the amounts. He went onto deny having any other consequences related to his drinking such as other legal troubles, financial or familial difficulties and states he has never experienced the phenomenon of passing out or blacking out due to his drinking. Finally, when asked, he states he does not view himself as an alcoholic or having a drinking problem.

Other drug use he reports having participated in is the use of cannabis which he states he began when he was living in Nashville and claims this was something he engaged in on four or five

occasions before discontinuing due to his dislike for the experience. Eric denied any other drug use and states he has never engaged in any other behaviors which may have been consistent with a drug using culture. When asked, he denied feeling as though he suffered from any form of addiction however he did acknowledge a family history of alcohol/drug abuse and/or possibly addiction, stating his father and uncles had such issues.

## Testing Results

During sex offender evaluations and risk assessments it is customary to have the client complete a variety of psychological and/or personality inventories and/or tests. Remaining consistent with this practice, Mr. Ingram was given the following testing instruments; *The OMNI – IV Personality Disorder Inventory, The Burns Anxiety Inventory, The Michigan Alcoholism Screening Test* and *The Beck Depression Inventory.*

### *The OMNI-IV Personality Disorder Inventory:*

The OMNI-IV is a 210-item personality inventory test containing ten personality disorder scales, a validity scale and a scale indicating current distress. The ten personality disorders include; *paranoid, schizoid, schizotypal, antisocial, borderline, histrionic, narcissistic, avoidant, dependent,* and *obsessive-compulsive* disorders.

When interpreting Mr. Ingram's OMINI-IV tests the validity scale suggests he answered all the items in a consistent manner. Additionally, it seems as though he had not experienced any significant amount of distress during the past week prior to the interview.

When reviewing the personality disorder scales measured by the OMNI-IV, "T" scores at or above a 70 suggest a clinically significant personality dysfunction. In examining Mr. Ingram's "T" scores it appears as though he scored within the appropriate ranges as those who have been found to be without any personality abnormalities or anomalies within the research utilizing the OMNI-IV as a testing instrument. As such it appears as though he has no Axis II Personality Disorders present at this time.

### *The Beck Depression Inventory:*

The Beck Depression Inventory (BDI) is a twenty-one item self-report developed to assess the individual completing the test for any possible depression.

Eric's score on the BDI was an eleven (11), which appears to place him in a range which has typically been associated with individuals who may possibly be suffering from a mild mood disturbance. Although Mr. Ingram did not mention any of this, or the items he had endorsed at any time during the interview and may have been a result of impression management (i.e. a conscious process in which people attempt to influence the perceptions of other people about a person, object or event by regulating and controlling information in a social interaction) on his part.

*The Burns Anxiety Inventory:*

The Burns Anxiety Inventory (BAI) is a thirty-three item self-report developed to assess the individual completing the test for any possible concerns of anxiety.

Eric's score on the BAI was a five (5), which appears to place him in a range which has typically been associated with individuals who, in studies using the BAI, seem to be dealing with minimal to no anxiety at the time of taking his inventory.

*The Michigan Alcoholism Screening Test (MAST):*

The MAST (Selzer, 1971) is a 26 item questionnaire and self-test designed to assess for alcoholism and/or addiction. The MAST has been studied in numerous studies and has been found to be reliable in the measuring of symptoms consistent with the diagnoses of alcoholism (Gibbs, 1983).

In scoring the MAST scores of: 0 to 4 are considered non-alcoholic; 5 to 6 possible alcoholism and 7 and above are viewed as symptomatic of alcoholism (Selzer, Vinokur, and van Rooijen; 1975). Additional studies (Skinner; 1982) suggest scores between 7 and 24 should be considered as "evidence of substantial alcohol problems.

In reviewing Mr. Ingram's scores he endorsed five (5) items on the MAST. Individuals who have similar scores and endorsements on the MAST as Mr. Ingram have often been identified in research to be those typically having misused or possibly abused alcohol at the time of taking the inventory.

**Additional Inventories and Questionnaires**

In addition to the above testing and inventories, sexual offender evaluations and risk assessments customary make use of other inventories or questionnaires focused in areas such as sexual attitudes, cognitive distortions, sexualized behaviors and etc. In maintaining this practice Eric was given the following questionnaires to complete; *The Hare Psychopathy Checklist-Revised* and *The Bumby Cognitive Distortion Scale.*

*The Hare Psychopathy Checklist-Revised (Hare PCL-R):*

The *Hare Psychopathy Checklist-Revised 2nd Edition* (Hare, 2003) uses both interviews and the review of collateral information to provide a dimensional score that represents the extent to which an individual is judged to match the prototypical psychopath. Although the concept of psychopathy is complex, psychopaths are usually perceived as being grandiose, arrogant, callous, dominant, superficial, deceptive, and manipulative. Because of this, these people are often unable to form strong emotional bonds and are lacking in empathy and deep-seated emotions. Scores on the PCL-R range from a minimum of 0 to the maximum score of 40. Any person scoring a 30 or above could be considered a psychopath.

Based on the interview and review of collateral information, Mr. Ingram's psychopathy score is a seven (7), which at this time places him below the threshold for North American male offenders to be considered as having psychopathy yet within the 5th percentile. This score is the sum of those points

scored to him in the Factor 1 and Factor 2 scales as well as additional points counted outside these two factors.

*The Bumby Cognitive Distortion Scales:*

The Bumby Cognitive Distortion Scale (K.M. Bumby, 1995) is a 36 item questionnaire given to the interviewee to complete. The questionnaire utilizes self-reporting responses sentences related to sexually offensive attitudes and paradigms. The scales are broken into two indexes, a series of sentences related to child molestation and the second index for rape. Each sentence presents a statement followed by a choice of four answers including strongly disagree, disagree, agree to strongly agree. The interviewee completes the instrument by reading each sentence and circling one of the four possible answers based upon his opinion of the statement.

In reviewing Eric's endorsements it seems as though he the items which he endorsed with some form of acceptance appeared to be distortions related to victims being curious about sexual activity or possibly enjoying it as well as a possible belief some children may enjoy sexual activity with an adult because it makes them feel more wanted or loved. Additional endorsements on his part may suggest he has a belief some children are willing and eager to have sexual activities with adults as well as acting or behaving seductively at times. Further endorsements by Eric indicate he may feel some victims initiate sexual activity and how adults may turn to sexual interactions with children because they are deprived of sexual activities with age appropriate partners. In reviewing his endorsements on the "rape" scale, it seems as though his endorsements support distortions suggesting women may act like they are too good for men and how a sexual assault may occur due to the offender attempting to put the female "in her place."

*The Internet Sex Screening Test (ISST):*

The Internet Sex Screening Test (ISST) (Delmonico, 1999) consists of 25 core domains and 9 general offline sexual compulsivity items. It is not a "risk assessment instrument" per se but is used rather to assist in individuals identifying if any problems exist with online use and/or the online viewing of sexually explicit images. As such it is used more here for the purpose of assisting in the development of recommendations should a problem be identified.

Delmonico and Miller (2003) reported in their research a yield of eight distinct subscales with low to moderate internal consistency reliability (.51-.86). These subscales include: *online sexual compulsivity, online sexual behavior:social, online sexual behavior:isolated, online sexual spending, interest in only sexual behavior, non-home use of a computer, illegal sexual use of a computer* and *general sexual compulsivity.*

In reviewing the scores for Mr. Ingram on the ISST it seems as though he endorsed those items, such as searching for sexual material on the internet, engaging in sexually related chats, having alterations in moods before and after sexual behavior on the internet, an inability to discontinue or stop engaging in such behavior and taking greater risks via such materials, which would place him at a significant risk for consequence regarding his viewing practices and suggests clinical assistance with a therapist to further assess and treat the potential online addictive behavior(s).

## Issue and Measurements of Recidivistic Risk

Accuracy of unguided clinical assessments is typically only slightly above chance levels (Hanson & Bussiere, 1998). Actuarial measures have a moderate degree of predictive accuracy and have been recommended as a component of best practices (Beech et al., 2003) and no single actuarial measure has been consistently superior across samples (Hanson & Morton-Bourgon, 2004). Hanson (1998) wrote there were "three plausible approaches to conducting risk assessments; *guided clinical, pure actuarial,* and *adjusted actuarial*" (p.52). Unlike guided clinical assessment, which proceeds under untested assumptions about how risk factors sum to yield a final assessment of risk, pure actuarial assessments sum a limited number of known risk factors "using a predetermined, numerical weighting system" (p.53). One weakness of pure actuarial assessment, compared to guided clinical assessment, is no single actuarial instrument assesses all known or potential risk factors, yet such factors should not be excluded from risk assessment. The adjusted actuarial approach begins with an actuarial prediction of risk, then the evaluator considers whether the actuarial predictions fairly represent the risk of the specific offender after considering potentially important factors which were not included in the actuarial measure (Webster, Harris, Rice, Cormier & Quinsey, 1994). An adjusted actuarial approach was utilized to determine Mr. Ingram's level of risk.

It is important to understand the difference between the statutory threshold for dangerousness and estimates of recidivism provided by actuarial instruments. By Illinois Statute, an individual is dangerous if it is "substantially probable that the person will engage in acts of sexual violence" (725 ILCS 207/5(f)). The actuarial assessment instruments utilized in this evaluation provide estimates of the likelihood a confined sex offender, at some defined interval after release, engaged in an act of sexual violence. The answer to the statutory question regarding engaging in acts of sexual violence becomes confounded, in any risk assessment, with measures of how well the criminal justice system detects sexual violence and brings formal charges and/or prosecutes offenders. There are multiple reasons to believe the justice system neither detects nor prosecutes all acts of sexual violence (Doren, 1998; Hanson & Bussiere, 1998; Wood, Grossman, & Fichtner, 2000; Hanson & Morton-Bourgon, 2004). Additionally the threshold for dangerousness is not time limited, whereas the actuarial instruments are often researched within certain time periods. Therefore, although actuarial predictions are more accurate than most other assessment methods it is best to view them as conservative predictions which research suggests underestimate actual risk.

In assessing Mr. Ingram's potential risk for re-offense the following instruments were also used; *The Sexual Violence Coding Sheet (SVR-20), The Static-99 Scoring Sheet-Revised, The Stable 2007,* and *The Worksheet of Risk Factors to Assess Outside the Static-99.* Although each instrument has its own method by which to imply risk they tend to use a continuum including; *Low, Low-Moderate, Moderate, Moderate-High* and *High.*

In reviewing the results from the instruments utilized in Mr. Ingram's evaluation it is important to note although those risk factors identified on each actuarial or assessment instrument are specific to Mr. Ingram's overall risk estimates they do not directly correspond to risk of re-offending specific to him as the estimates are based on group estimates found in research and meta-analysis. Eric's risk may be higher or lower than indicated estimates depending on other risk factors not measured by each specific instrument. In an attempt to assist in ruling out the potentially wide variations this

evaluator used a variety of instruments, all measuring similar yet different factors, in an attempt to gain a more precise estimate.

*The SVR-20 (Sexual Violence Risk Coding Sheet):*

The SVR-20 coding sheet is a tool created by Boer, Hart, Kropp and Webster (1997) and is a tool that uses static and dynamic factors to assess for possible risk associated with sexual violence. The SVR-20 evaluates factors such as denial and minimization of the offense, psychopathy, relationship issues, sexual deviance, and attitudes toward intervention.

In reviewing the SVR-20 Coding Sheet in relation to Mr. Ingram, it indicates the following factors as potential risks:
- Presence of sexual deviation (i.e. evidenced through reports)
- Substance use problems (i.e. DUI)
- Relationship difficulties/problems
- History of involvement with the criminal justice system (i.e. DUI conviction)
- Possible minimization and/or denial related to offending behavior

Based on these and other factors it appears as though Mr. Ingram falls into a category of individuals who, in research using the SVR-20 as a predictive instrument, were seen to be at a **low-moderate risk** for recidivistic tendency.

*The Static-99 Sex-Offender Risk Assessment-Revised:*

The Static-99R (Harris, Phenix, Hanson and Thornton) is a tool intended to be used as a brief screening instrument for predicting sex offender recidivism. It is called the Static-99R to indicate that it only includes static factors (i.e. family history, criminal background, previous offenses) in its assessment of recidivism and was formulated in 1999. The Static-99R is intended to be a measure of long-term risk potential and is intended for males who are at least eighteen years of age. The Static-99R has been documented to show moderate predictive accuracy for both sexual recidivism and violent recidivism.

In reviewing the Static-99R, it identified certain static (unchanging) risk factors which were counted in the overall scoring. These included:
- Eric's age (i.e. age being correlated to potential for recidivism)
- Intimacy/relationship deficits
- Presence of a victim who was unrelated to him

In reviewing the Static-99R scores it appears to place Eric within a group which statistically in research, were at an **average risk** for re-offense. In research utilizing the Static-99R as an instrument to assess potential recidivism, populations with scores comparable with Eric's scores where roughly in the 66th percentile. Taking into account about 17 percent of the offenders within the research shared the same score as Eric, the percentile means roughly 57 percent of offenders scored lower than he while 26 percent had higher scores. These percentiles are from 2,011 cases from 4 samples of Canadian sex offenders, which were reweighted to approximate the distribution of all convicted

1:18-cr-10060-MMM-JEH  # 26-1  Page 16 of 18

Eric Ingram - Sexual Offender Evaluation and Risk Assessment          Page 16 of 19

sex offenders in Canada. These percentiles appear highly stable in international comparisons with large, relatively representative samples in Sweden and California.

In addition to the above outcomes, the research goes onto suggest the recidivism rate of sex offenders with the same score as Mr. Ingram would be expected to be higher than those individuals who had the same recidivism rate of the "typical" sexual offender as defined within the research. (Hanson, R.K., Lloyd, C.D., Helmus, L., & Thornton, D.; in press)

*The STABLE 2007:*

The STABLE 2007 (Hanson, Harris, Lynne Scott & Helmus, 2007) is a tool designed to assess and track changes in risk status over time by assessing changeable factors. "STABLE" dynamic risk factors include those personal skills which can be changed through a process of learned behaviors which can be correlated to sexual recidivism yet through a process of "effortful intervention", such as therapy, may be altered. The factors examined include (but are not limited to): social influences, relationship stability, hostility towards women, impulsivity, sexual deviance, problem solving skills, empathy and etc.

In scoring Mr. Ingram on the STABLE 2007 scoring sheet the following issues are of concern:
- Poor capacity for healthy relationship stability at this time
- Lack of significant social influences
- Emotional identification with the victim
- Impulsivity
- Poor problem solving skills
- Deviant sexual behavior (i.e. evidence with conviction)

In reviewing the STABLE 2007 scores it appears to place Mr. Ingram within a group which statistically in research, were at a **moderate risk** for re-offense. Furthermore, in cross scoring the STABLE with the scores on the Static-99R for an "adjusted" assessment of risk as suggested by Hanson, Harris, Lynne Scott & Helmus, Mr. Ingram's characteristics would again seem to place him in a group found in research to be at a **low-moderate risk** for recidivism.

**Other Empirical Risk Factors**

In other research and meta-analysis conducted (i.e. Hanson & Bussiere, 1998; Hanson & Harris, 2000; Craig et al., 2003 and etc.) other factors not associated with any actuarial have been identified as being specific to recidivistic tendencies. These are often categorized into three categories including; *static* (historic/unchangeable), *dynamic* (changing with time), and *acute* (related to imminent recidivism). In performing an evaluation it is "best practice" to also take these factors into consideration for although not always scored on the actuarial instruments, research has identified correlations which are best considered in the overall assessment of risk.

In examining other risk factors Mr. Ingram appears to meet/possess the additional risk factors:
- Potentially maladjustment/chaotic life as a youth
- Denial related to minimization of offending behavior
- Poor boundaries
- Immature/under developed relationship development skills

## Examination of Protective Factors

Protective factors are conditions which may lower one's risk(s) of sexual recidivism. Research in this area (i.e. Hanson et al., 2002; Losel & Schumucker, 2005; Harkins & Beech, 2007; and etc.) appears to suggest an offender can reduce their risk(s) of re-offending by taking specific proactive steps which will assist them in coping with the risks and triggers they may encounter during their interactions with people and situations. Although not always scored on an actuarial instrument it again is recommended to include them during an overall assessment of risk.

In examining protective factors Mr. Ingram appears to possess the following factors:
- Support of family
- Good employment history
- What seems to be a willingness to comply with supervision requirements

## Evaluation Findings

I found Mr. Ingram to be well-groomed and hygienically clean in appearance. He presented as polite, respectful and cooperative throughout the evaluation and seemed to engage well in answering those questions posed to him. His affect appeared to be appropriately animated where he demonstrated a range of emotions consistent with his surroundings and circumstance ranging from bright and smiling to thoughtful and teary. During the session he sat upright in what appeared to be a relaxed body posture, made good use of eye and voice contact and appeared engaging in the conversations which were occurring. In speaking of his offending behavior, he appeared to present as being liable for the circumstances as well as accountable for the actions which led to his offense. On occasion he seemed to make use of some cognitive distortions which are commonly observed in offending populations, however his sense of accountability and realization of his offending behavior was evident as was a presence of feelings such as guilt, shame and regret. In speaking of his actions and the potential consequence, Mr. Ingram also appeared to identify how his actions may impair the victim (i.e. victim empathy) and her possible future. Throughout the interview process he appeared to be congruent and fluid in his thought process, in control of his faculties and seemed to be oriented to person, place and time.

In discussing his psychological health, Eric did not seem to present with any diagnostic criteria or symptomology consistent with any psychological or psychiatric issues as outlined within the Diagnostic Statistical Manual-Fifth Edition, nor did he appear to present at any current risk of suicidal or homicidal ideation.

In exploring for potential sexual disorders and/or paraphilic behaviors, Mr. Ingram's disclosures discussing his sexual interests, urges and practices do not seem to suggest potential difficulties in "hypersexuality" (Stein, Black, Shapira & Spitzer, 2001, Kalfka, 2003, Langstom & Hanson, 2006, and etc.) at this time nor do they seem consistent with any current specific diagnosable paraphilic sexual disorder. This does not rule out the potential danger or consequence(s) related to any of the offending behaviors outlined in the documentation, but simply suggests the probability of the behaviors generating from a different etiology other than a specific psychological or paraphilic disorder at this time, such as underdeveloped relationship development skills, poor boundaries, immature understanding of sexually intimate relationships and etc.

B. Mr. Ingram seems to have protective factors present as well which may assist in the potential reduction of recidivistic tendency.

Given the above information and conclusions the following may be recommended should he receive a community based sentence:

A. Mr. Ingram is recommended to be monitored by a supervising officer experienced with supervising at risk clients.

B. Mr. Ingram is recommended to comply with all requirements and regulations imposed on him by his supervising agency.

C. Mr. Ingram is recommended to participate in sex offender specific therapy with a Licensed Sex Offender Treatment Provider experienced with sex offender specific issues including; denial, offense cycles, risk factors, relapse prevention, victim empathy and etc.

D. Mr. Ingram is recommended to have absolutely no contact with the victim, either; face-to-face, telephone, written or electronic, or through third party.

E. Mr. Ingram is recommended to remain totally abstinent from any and all forms of pornographic material/images (i.e. video/DVD, magazine, television, cell phone and etc.)

F. Mr. Ingram is recommended to remain totally abstinent from all mood altering chemicals including alcohol and cannabis.

G. Mr. Ingram is recommended to obtain and maintain gainful employment.

H. Mr. Ingram is recommended to fulfill his financial responsibilities to the court system for past and present court costs, fines and fees.

Should the above recommendations be deemed appropriate by the court system, failure to comply with any one of these recommendations should be viewed as the client's non-compliance and as an increased risk for relapse and potential re-offense. In such an event it is recommended at that time the client's probation be revoked and the client incarcerated for the safety of the victim and the community.

Respectfully Submitted,

Michael Kleppin, M.S.Ed., L.C.P.C., C.A.D.C.
Licensed Sex Offender Evaluator
Licensed Sex Offender Treatment Provider