1          UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF ILLINOIS

3   UNITED STATES OF AMERICA,   )  Docket No. 18-cr-10060
                                )
4        Plaintiff,             )
    vs.                         )  Peoria, Illinois
5                               )  August 20, 2019
    ERIC INGRAM,                )
6                               )
         Defendant.             )
7   _____)

8
                  RECORD OF PROCEEDINGS
9                 SENTENCING HEARING
        BEFORE THE HONORABLE MICHAEL M. MIHM
10           UNITED STATES DISTRICT JUDGE

11
                  THE APPEARANCES
12
               KATHERINE G. LEGGE, ESQ.
13             Assistant U.S. Attorney
           One Technology Plaza, Suite 400
14              211 Fulton Street
                Peoria, IL  61602
15           On behalf of the Plaintiff

16
            CHARLES GREGORY SCHIERER, ESQ.
17             Schierer & Ritchie
               1009 Illini Drive
18           East Peoria, IL  61611
             On behalf of the Defendant

19

20

21

22           Nancy Mersot, CSR, RPR
        United States District Court Reporter
23           100 N.E. Monroe Street
                Peoria, IL  61602
24
    Proceedings recorded by mechanical stenography,
25  transcript produced by computer-aided transcription.

```
 1          (In open court, 11:00 a.m.)
 2          THE COURT:  Good morning.
 3          MS. LEGGE: Good morning.
 4          MR. SCHIERER:  Good morning, Judge.
 5          THE COURT:  This is the case of the United
 6 States of America v. Eric Ingram, criminal number
 7 18-10060.
 8          The defendant is in court represented by his
 9 attorney Charles Schierer.
10          The United States is represented by Kate
11 Legge.
12          The matter is set today for sentencing.
13          The defendant previously entered pleas of
14 guilty to Count 1 of an indictment charging receipt
15 of child pornography, and Count 2 charging receipt
16 of child pornography.
17          The Court directed the probation office to
18 prepare a written Presentence Report.  That was
19 done.  Copies were made available to everyone
20 including the defendant.
21          Mr. Schierer, have you had a reasonable
22 opportunity to read the report and review it with
23 your client?
24          MR. SCHIERER:  Yes, Judge.
25          THE COURT:  Based on your reading and
```

1  review, is there anything in the report you feel is

2  inaccurate or incomplete that you wish to challenge?

3          MR. SCHIERER:  No, Judge.

4          THE COURT:  Thank you.

5          Mr. Ingram, have you had a reasonable

6  opportunity to read this report and review it with

7  your attorney?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  Based on your reading and

10  review, is there anything in the report that you

11  feel is inaccurate or incomplete that you wish to

12  challenge?

13          THE DEFENDANT:  No, sir.

14          THE COURT:  You understand you have the

15  opportunity to present evidence in mitigation here

16  this morning.

17          You also have the right to make a statement

18  to the Court on your own behalf before I impose

19  sentence.

20          Do you understand that?

21          THE DEFENDANT: Yes, sir.

22          THE COURT:  Ms. Legge, are you aware of

23  anything in the report that is inaccurate?

24          MS. LEGGE:  Your Honor, no, but I do have

25  one agreement that I would like to present to the

```
 1  Court as to restitution.
 2          THE COURT:  Oh, okay.
 3          MS. LEGGE: The parties would both recommend
 4  to the Court that the restitution in this case
 5  should be a fixed amount of $3,000 to the victim.
 6          THE COURT:  Okay.  This would be to the
 7  victim?
 8          MS. LEGGE: Yes, Your Honor.
 9          THE COURT:  Okay.
10          MS. LEGGE: And I can provide the clerk the
11  appropriate address.
12          THE COURT:  Okay.  Great.  And I assume
13  that's correct, Mr. Schierer?
14          MS. LEGGE: Yes, Judge.
15          THE COURT:  Anything in addition,
16  Miss Legge?
17          MS. LEGGE: No, Your Honor.
18          THE COURT:  Do you have any additional
19  evidence in aggravation?
20          MS. LEGGE: Earlier I did tender to the Court
21  by the way of the United States Probation Office, a
22  victim impact statement of the victim in this case.
23  We would ask that that be incorporated as part of
24  our evidence and filed under seal.
25          THE COURT:  I did read that.  I note that
```

1  the name has been deleted, so I assume it could be
2  part of the public record?
3        MS. LEGGE: That's correct, Your Honor.
4        THE COURT:  Okay.  And I assume there is no
5  objection to that?
6        MR. SCHIERER:  No objection.
7        THE COURT:  Okay.  As to mitigating
8  evidence, I did receive a number of letters in
9  support, and I have read each of those.  There's
10 also, I think, at least one -- there's two
11 certificates attached; and there is also a sex
12 offender evaluation and risk assessment.
13       MR. SCHIERER:  Yes, Judge.  We wouldn't have
14 anything additional other than what you have
15 received.
16       THE COURT:  Okay.  The letters of support
17 will be made part of the public record in the case.
18 The Sexual Offender Evaluation and Risk Assessment
19 will be part of the record but it will be sealed,
20 okay?
21       Is there any additional evidence you wish to
22 present in mitigation?
23       MR. SCHIERER:  No, Judge.
24       THE COURT:  So the sentencing profile that
25 we have is a total offense level of 35, a Criminal

1  History Category II; that creates a custody range of

2  188 to 235 months.

3          Supervised release on each of the counts is

4  five years to life.

5          There's a fine range of 40,000 to $250,000.

6          Restitution by agreement in the amount of

7  $3,000.

8          And a special assessment of $100 on each

9  count for a total of $200.

10          Does counsel agree that's the correct

11  sentencing profile?

12          MS. LEGGE:  Your Honor, I would just note

13  for the Court that it would be a $5,000 mandatory

14  special assessment on each count unless the Court

15  did find on the record that the defendant was

16  indigent.

17          THE COURT:  Unless the Court found what?

18          MS. LEGGE: That the defendant was indigent

19  and could not pay.

20          THE COURT:  What's your position on that?

21          MR. SCHIERER:  Judge, I believe --

22          THE COURT:  Hold on a minute.  What's your

23  position on that?

24          MS. LEGGE: At the current time, I do believe

25  that he is incarcerated and the PSR would accurately

1  reflect that he does not have any income.

2          THE COURT:  All right.  Thank you.

3          Were you going to say something?

4          MR. SCHIERER:  I was just going to agree

5  with that, Judge, on page 20 he has a negative net

6  worth.

7          THE COURT:  Okay.  Fine.

8          Miss Legge, do you have a statement to make

9  regarding sentence?

10          MS. LEGGE: Yes, Your Honor.

11          THE COURT:  Go ahead.

12          MS. LEGGE: May I request the clerk activate

13  the ELMO?

14          Thank you.

15          May it please the Court.

16          THE COURT:  It takes a minute for this to

17  come up.  Is it up already?

18          THE CLERK:  It will take about five seconds.

19          THE COURT:  How long?

20          THE CLERK:  About five seconds.

21          THE COURT:  We will see if you're correct.

22          THE CLERK:  Maybe longer.

23          THE COURT:  All right.

24          MS. LEGGE: Thank you.

25          May it please the Court.  The offense the

1  defendant has committed in this case is no doubt a
2  very serious and grave offense.  And what we expect
3  the defendant to request in his request for
4  leniency, as we've demonstrated throughout the
5  letters and the evaluation submitted to the Court,
6  is that this was a one time offense; this was
7  isolated; that he otherwise has no criminal conduct
8  or criminal history; and he's otherwise a decent
9  person.  The government has no reason to dispute any
10 of the letters submitted by the defendant.  No
11 reason to dispute any of the facts in the PSR as to
12 his background, and it's very clear that but for his
13 -- the loving care of his grandparents, the
14 defendant would have been on a negative trajectory
15 because of his parents' behavior.
16        But what that argument minimizes is the
17 defendant, for lack of better terms, grooming of the
18 15-year-old minor victim in this case.  This is not
19 a minor victim that he met online and did not know
20 face-to-face.  This is not a minor victim that he
21 didn't know exactly how old she was.  In fact, he
22 stated he had known this victim for about five or
23 six years putting him first knowing her at age nine
24 or ten.  They met through a personal relationship by
25 one of his friends that she was the younger sister

1 of the friend's girlfriend, and they began a
2 friendship.
3          In July of 2018 or sometime before that, he
4 began communicating with her through Facebook and
5 began teaching her the ways of the world as it
6 relates to sexually explicit conduct between adults.
7 However, she was 15 at the time and he knew it.
8          At some date prior to -- excuse me --
9 July 19, 2018, he sends the minor victim a video of
10 a woman masturbating and told her and instructed her
11 to watch this video and learn how to do it and do
12 that for me.  This occurred not once but multiple
13 times where he instructed her and directed her on
14 how to do the things he wanted her to do, how to
15 commit the sexually explicit conduct that later he
16 instructed her to take pictures and videos of.
17          On one of these conversations he is
18 instructing her to put a hair brush handle in her
19 vagina.
20          In a chat on July 19, 2018, between the
21 defendant and this minor victim, he says, "Okay,
22 let's get started."  He says, "I want to see it in
23 you."
24          And she replies, "It hurts to put it in
25 tonight."

1    His next reply, "Let me see you putting it

2 in."  He then gives her directions how to manually

3 stimulate herself to make it easier for her.

4    Later in the conversation he says, "How does

5 the brush feel?"

6    She says, "It stills hurts."

7    He says, "How bad?"

8    She says, "Not as bad as last night but it

9 still hurts though."

10    And his reply, "I want to see."

11    His next message to her, "How does it feel?"

12    She says, "That hurt me even more."

13    At his request, this victim sends him videos

14 of her conduct that he has taught her how to do and

15 instructed her how to do.

16    And at one point later in a conversation, he

17 says, "Well, keep doing it."

18    And she replies, "You're enjoying this,

19 aren't you?"

20    And he says, "More than you are."

21    Numerous files, both images and video files

22 were created by this minor victim for the defendant

23 with him giving her explicit direction on what to do

24 and where to place the camera and to send it to him

25 over Facebook messenger.  The chats continue and

1 they escalate until July 31st he claims that he is

2 going to buy this minor victim a real vibrator.  And

3 he says that he will pick one up and leave it next

4 to her garage because this minor victim and this

5 defendant knew each other personally.  He knew where

6 she lived, and he knew where her garage was, and he

7 knew where he could leave it so that she could find

8 it.  Instructs her to make sure she can hide it well

9 from her parents.

10         Later the conversations continue to escalate

11 as he wants her to do more and more sexually

12 explicit conduct with him.

13         On August 1st in this chat series, the

14 defendant tells the minor victim, through a Facebook

15 messenger conversation, that he wants her to break

16 away from a bike ride that she is going on with her

17 friends and he wants to meet her.  The minor victim

18 states, "You can't."

19         And the defendant says, "Yes, I can."

20         And she says, "No."

21         Later on in the conversation, approximately

22 eight to ten lines down he says, "If we meet

23 tonight, I'd be fingering you."

24         The minor victim is the one who says, "No."

25         Later he says, "We would find a spot and I

1  would finger you."

2          And she says, "Honey, we can't."  This

3  15-year-old minor victim being the one with the

4  wherewithal to tell him that he is inappropriate.

5  And at some point this victim told the defendant she

6  needed to stop sending him these sexually explicit

7  video files because it wasn't right.  And he then,

8  according to her, discontinued having contact with

9  her because she stopped sending these files.

10          And then in September he contacts her again,

11  asks that she's still playing or did you quit?  And

12  asks "if it feels the same as when I first taught

13  you," he states.

14          But for the internal monitors of Facebook,

15  this offense would have never come to light because

16  Facebook reported this inappropriate conduct and

17  sensed that both the victim and the defendant were

18  within the same town.  They alerted the National

19  Center For Missing and Exploited Children who then

20  forwarded this information to the Washington Police

21  Department who acted swiftly to investigate the

22  crime.

23          The defendant, to his credit, was

24  cooperative with law enforcement; admitted that he

25  traded sexual files with the minor victim; admitted

1   that he had feelings for her even though he knew it

2   was wrong; and he admitted that he discussed

3   purchasing her a sex toy and having sexual contact

4   with her.

5          The defendant -- or excuse me -- the victim

6   is in this case unusual because she's a local victim

7   that he knew personally and a victim in which she

8   trusted and believed that she had a friendship with.

9          The cross-reference in this case under the

10  Sentencing Guidelines Section 2G2.2 for production

11  applies and the government believes that every bit

12  of that cross-reference is appropriate as well as

13  the enhancements as outlined in the PSR.

14         In reviewing the defendant's sentencing

15  memorandum and commentary and the numerous letters

16  from people who no doubt support him and wish him

17  the best, many of whom I believe are here today in

18  court, demonstrate a gentleman who made the best of

19  a poor upbringing; had a loving relationship with

20  his grandmother and his grandfather; excelled at Boy

21  Scouts, achieving the level of eagle scout; had

22  numerous achievements throughout his life despite

23  the rocky beginning from his parents.  And for all

24  intents and purposes made a great neighbor and

25  church member.  And the government has no reason to

1    dispute any of that.

2         In his evaluation from Dr. Kleppin, what I

3    find is most interesting as well, which is

4    consistent with the letters provided in support of

5    him is the numerous evaluations and assessments that

6    were given to Mr. Ingram to try to find out what is

7    the pathology that makes him -- made him do this

8    awful conduct; why is it that he did what he did;

9    does he have a psychological issue; a mental health

10   issue; did he have substance abuse issues or some

11   other sexually related deviant personality disorder?

12   And overwhelmingly this very thorough assessment

13   says no, there is no personality disorder; there is

14   no, minimal anxiety.

15        There is -- excuse me -- there is a good

16   work ethic, very strong work ethic, actually; good

17   physical health; denied any current difficulties

18   psychologically; no hyper-sexuality issues; no

19   alcoholism issues; no substance abuse issues; no

20   personality disorders; a very low score on the Hare

21   Psychopathy -- Psychopathy Checklist; low to

22   moderate risk for recidivism; average risk for

23   recidivism in a different testing; moderate risk for

24   re-offense on a different testing.

25        So, at first blush that is almost more

1  alarming than if we had some reason to point to, but
2  we have someone who has appeared to be -- who has
3  been a productive member of society as far as a work
4  ethic.  He has held a good job.  He has been helpful
5  to the people in his life, including his grandmother
6  and neighbors.  But under the surface, behind all of
7  that, with no overt reasons to cause such behavior,
8  we have what is the grave stealing of the innocence,
9  of this 15-year-old, who I believe in her own words
10  says it best about the impact of his actions
11  grooming her to create these images for his own
12  sexual gratification.  And I'm displaying her victim
13  impact statement on the screen and I would now
14  request to read it in open court.
15          THE COURT:  Go ahead.
16          MS. LEGGE:  "Because of what happened, I get
17  nervous and scared when I hear about him.  I also
18  get scared to talk about the situation.  For a long
19  time I have been having a lot nightmares.  I felt
20  really scared and confused at the time.  I always
21  felt scared when he made me try new things.  I felt
22  like he was trying to make me do bad stuff.
23          For the longest time, I stayed away from my
24  friends and my family.  Sometimes at home I get
25  scared because of what happened.  What makes me sad

1   is feeling that this is all my fault, even though I

2   know it is not my fault.

3       I didn't expect that I would no longer be

4   able to use social media to talk to my friends.  It

5   is now hard to hang out with my friends and my

6   sister because this has scared me so much.

7       In the future, I'm looking forward to

8   getting my driver's license and a job, also finish

9   high school and go to college.

10      I am mad knowing how scared I will be when

11  he gets out.  What will he do, like will he cause

12  problems for me and my family?  I don't want him to

13  be able to do this ever again."

14      This letter demonstrates a 15-year-old who

15  clearly felt vulnerable and timid under the

16  direction of the defendant's orders to create these

17  images.

18      The harm that this little girl will face the

19  rest of her life will never be fixed.  It will never

20  go away.  We can hope through counseling and through

21  processing that she's able to get past this and not

22  let it affect her.  But we know that even just in

23  the year since the arrest, she's had nightmares and

24  it's changed her life for the worst.

25      So for those reasons, we do ask the Court to

adopt not only our restitution request of $3,000,
but we ask the Court to impose what we believe the
guidelines appropriately set as the range of 188 to
235 months.  We do believe that the 188 months
followed by five years of supervised release is
appropriate.

        The nature and circumstances of this offense
is grave.  We have a live local victim, who, but for
Facebook shutting down the chats and reporting it to
law enforcement, could have very well been a
hands-on victim of the defendant.

        We believe that this sentence would
accurately deter this defendant but also deter
others from similar conduct and protect not only the
public but this victim from further crimes of the
defendant.

        It is hard to put into words the loss of the
innocence of this victim, and it's hard to quantify
the amount of remorse that I'm sure the defendant
will illustrate to the Court, but because of now a
new victim, a new child has been identified, a new
contact is in the NCMEC system to be identified for
future, we believe this sentence requested is most
appropriate.  Thank you.

        THE COURT:  All right.  Thank you.

1          Mr. Schierer.

2          MR. SCHIERER:  Thank you, Judge.

3          May it please the Court, and counsel.

4          I'm not at all going to try to even argue to

5 you the behavior.  Nobody here would argue the

6 behavior, and the defendant more than anyone else is

7 not trying to justify the behavior.  What we are

8 here to do is figure out what's appropriate, but no

9 more than that, because that's -- the law is that

10 the sentence should be nothing more than what is

11 required.

12          And so in looking at Eric, let's start with

13 the letters.  Jo Ann Brunk, his grandmother, his

14 grandmother was more than a grandmother.  She turned

15 out to be his mother.  She had to.  Eric's mother

16 was troubled, to say the least.  Eric's father was

17 troubled.  They abandoned him when he was most

18 vulnerable, and grandma and grandpa stepped up, Jo

19 Ann and Bill, and they raised him from the age of 21

20 months even going to court so as to protect him.

21          One of the things that Jo Ann put in her

22 letter -- and she's here today; she is right here --

23 is that "Eric always felt different than other

24 kids."  And that stuck out to me when I first met

25 with Jo Ann.  We sat in my office and we kind of

1  talked about this.  She mentioned it then and she
2  says it here, that he always felt different.
3       And the government was asking the question
4  how does this happen, how does a guy when you look
5  through the letters and you see he has good
6  character, you know, older, experienced people in
7  our society like him.  They have a great opinion of
8  him.  And generally we want to trust people who have
9  life experience to determine the character of human
10 beings because they have been around.  And when it
11 comes to Eric Ingram, the older you are, the better
12 opinion you seem to have of him.  And I trust those
13 people because they've got life experience.  They've
14 seen a lot of people come and go.  So, when you read
15 the letters and you see that they are from
16 experienced people and they judge his character as
17 positive, I hope that the Court would adopt that.
18      But the government asked, "Well, how does
19 this happen?"  And when you feel different from
20 other kids, I think that there is an element of
21 detachment there.  And, you know, just to call this
22 just a dumb thing is true, but I'm not sure it fully
23 captures it, because it was done online.  And it's
24 this epidemic of sorts of social media, that it's a
25 fantasy world; it isn't even real.

1        Now that isn't to say that he didn't know
2   what he was doing, and, you know, how serious it
3   was.  That's not what I'm saying.  I'm saying it's
4   different online when you can push a few buttons and
5   hit send versus doing something in person.  And in
6   person is far more dangerous, far more dangerous.
7        Now, his plea is to the receipt of child
8   porn.  But, essentially, the aggravation here is
9   essentially a production of child pornography or a
10  coercion of a young teenager to produce it.  But
11  that's not really in line with what we typically see
12  on this type of a charge.  And I'd ask why would
13  somebody go down that path, and I think it does come
14  back to this detachment and when you are detached
15  from, say, reality, but attachment in society who
16  are about your own age, you may be looking for an
17  outlet that doesn't line up with society.  And so
18  here you are online and you push some buttons and it
19  doesn't feel real.
20       I think for a smart kid like Eric -- I've
21  gotten a chance to get to know Eric and spend some
22  time with him.  He's smart.  And you have got all of
23  these people saying not only is he smart, he is a
24  kind, loving, generous person.  He is generous with
25  his time.  You have neighbors in there saying that

he is willing to go over and mow their yard and do
things for them.  And this is a young person.  So he
is generous.  So how does he take himself down such
a terrible path?  Because it's not real in a sense.
It's online.

        And so I think we have to ask the Court to
consider the difference between online and
in-person.  And this was not in-person.  Now while
he did know her, they did not meet up.  And texting
somebody to meet up doesn't necessarily mean that
you would have.  And if he does know her and knows
where she lives, certainly he could have found a way
to run into her if that's what he was really
intending to do.  And none of that happened.  And
there is really no suggestion that that's what
happened.  I think that's important.

        The letters go on to talk about some of the
challenges that he had.  Eric struggled
academically.  Not only does Jo Ann indicate that
but Muriel Graham indicates that.  Muriel is here
today.  Where is Muriel?  She is a school teacher.
She lived next door.  And she wrote a great letter
talking about Eric.  But she referred to Eric as an
old soul living in a young body.  And I found that
interesting.  She, in her letter talks about Eric

1  was always struggling to find a fit.  He found a fit
2  in scouting.  He was able to do that with Bill.  And
3  they together, as part of his scout project, brought
4  a decommissioned helicopter for a veterans memorial
5  and there was a picture provided in the materials to
6  the Court.  That was Eric doing that with Bill.
7  Spending his time as a young person.  And people now
8  in the past now and in the future get to enjoy that
9  memorial and what it signifies and that's part of
10  his hard work.
11       But Muriel would talk about how he struggled
12  at times in school as well.  She taught him social
13  studies, so she knows.  So his challenges were
14  extensive, not only abandoned by his parents, he had
15  ADD; he had some learning disability.  He felt
16  detached from other people.  There were challenges.
17  There really were.  And we'd ask the Court to
18  consider that.
19       Now, despite those challenges, we didn't see
20  Eric Ingram in the court system.  How shocking is
21  that, right?  A young person abandoned by their
22  parents and has a learning disability, couldn't get
23  through high school, had to go get a GED.  How often
24  do we see them in criminal court?  Yet, he doesn't
25  have that record.

1       So I think if we consider that, that helps
2  corroborate the other fine letters that talk about
3  him having good character, being kind, respectful
4  and generous.  I also point out that by all accounts
5  he's a good loving father.  He has a five-year-old
6  daughter.  And those who know him say that he dotes
7  on his daughter.  He loves his daughter.  She loves
8  him.  And there's going to be a real hardship on his
9  daughter.
10       Now, again, we always walk that fine line.
11  We get it.  There is an impact on the victim and she
12  has a tough road to go as well.  I'm not minimizing
13  that as well, I'm not at all, but his daughter does
14  too.  And she's five.  And, you know, whether you're
15  a perfect person or not, it's helpful to have your
16  father in your life.  And that impact on the
17  dependent I think is an important critical factor in
18  all of this.
19       Now, how do we get to a guideline range that
20  seems so high, 188 months.  That's what the
21  government suggested, at least that's what I heard,
22  that guideline range is 188 to 235.  How do we get
23  up to a number that high?  Well, the base level
24  offense is pretty high.  And I would ask the Court
25  to look at how it went up from the base level of 32.

1   We have this specific offense characteristic of

2   adding two additional points because it involved a

3   minor.  And while that's appropriate under the law,

4   all child pornography cases involve children.  And

5   so I'm always troubled by additional points that

6   already take in account the offense.  Child

7   pornography is identified as a 32 base level, yet we

8   are adding two because the victim is a child.  The

9   victim is always a child.

10          THE COURT:  Well, in order to have child

11  pornography, I think the child has to be under the

12  age of 18.  So, I think the added two points are

13  because the victim was younger than that.

14          MR. SCHIERER:  And, Judge, I'm not

15  disagreeing, and I'm not debating it.  What I'm

16  saying is child pornography involves children and

17  here we have child pornography at 32, but then we

18  are saying, well, it is a child that is 15 and we

19  will add two.  So all I'm suggesting is that the

20  base level takes into account that it is child

21  pornography.

22          On line 36 -- I'm sorry, excuse me.

23          Line 37, we talk about how computer service

24  was used, specifically Facebook, and another two

25  levels is added.  And that gets us ultimately up to

1  the 38, but to date this is how kids are

2  communicating.  And I touched on it but I think that

3  this is important.  It is far more dangerous to a

4  victim for communications to be in person.  We don't

5  know where those might lead.  Again, not justifying

6  it, but what I'm saying if we were to compare the

7  two, online versus in-person, in-person in general

8  would always be more serious.  And yet, here we

9  have, we are adding two because a computer was

10  involved.  That's how young people are

11  communicating.

12       So the Court could take into account that

13  additional two points as well.  So after his

14  acceptance of responsibility, the minus two points

15  and his plea, the minus one point; instead of being

16  at 35, he could be at 31, because those are, in

17  those two examples I gave adding four additional

18  points.  And if you're 31, the guideline range is

19  121 to 151.

20       The young lady wrote a letter and in there

21  she talked about how she's concerned about the

22  future.  But a 121-month sentence is ten years.  She

23  will be an adult, and nowhere in the messages and

24  nowhere presented by the government were any threats

25  of the defendant.  It was coercion, but nowhere --

1  and the government pointed it out that she said "no"

2  a couple of different times.  Nowhere were there any

3  threats.  That wasn't his response.  There is not an

4  ounce of evidence to suggest that he's a threat to

5  her to hurt her for being the victim in this case.

6  And it's also inconsistent with any of the letters

7  that you've seen.

8         Eric is remorseful and sad.  But he's also

9  got some hope for the future, and we saw that

10  through his work with the Job Partnership.  He is

11  not just sitting at the Peoria County Jail stewing

12  and blaming people.  He accepts responsibility and

13  he is trying to work on himself and his life to

14  become a better person.

15         Judge, I think if the Court would consider

16  the obstacles that he had, then consider his

17  character, overall character, his lack of criminal

18  history, and the fact that this was just a dumb

19  thing that he did in a sense enabled by the epidemic

20  of social media, that his contributions to society

21  would justify a below guideline range sentence when

22  we take into account that we got to that guideline

23  range by adding some additional points that are

24  already assumed in the charge.  And if we did that,

25  if he is under Criminal History Category II, and we

1  did a below guideline and we got him to an offense
2  of 31; that is 121 to 151.  And a ten-year sentence,
3  if the Court were to adopt, 121 months, that is a
4  significant sentence for what we have here.
5  Significant sentence for the receipt of child
6  pornography.
7          Now it's aggravating because the government
8  says that she's alive and local.  I'm not debating
9  that.  But a ten-year sentence, 121-month sentence
10  for child pornography is in line with what we can
11  see in these types of cases.  So that would be
12  appropriate.  He took responsibility.  He pled
13  guilty.  He even agreed to the $3,000 in
14  restitution.  I would say that that helped the
15  victim not have to come in here and testify.
16          Special assessment, we would ask for the
17  minimum and no fine because he just has no financial
18  ability to do that.
19          We'd ask for the minimum term of supervised
20  release, as I understand it's five years on both,
21  would be ten.
22          And that when you consider the whole picture
23  is a sufficient sentence but not more than it needs
24  to be under the law.
25          Thank you very much.

1          THE COURT:  Okay.  Thank you.

2          Mr. Ingram, is there anything you would like

3   to say to the Court on your own behalf before I

4   impose sentence?

5          THE DEFENDANT:  Well, I had prepared a

6   letter that I will read to the Court.

7          THE COURT:  Okay.  Fine.  I just ask that

8   you pull that microphone a little closer, please.

9   I'm a little hard of hearing.

10          Go ahead.

11          THE DEFENDANT:  Forgive me because the date

12   is different than what is today because --

13          THE COURT:  Hold on a second.  Is that

14   microphone on?  Try it now.

15          THE DEFENDANT:  Can you hear me?

16          THE COURT:  That's fine.

17          THE DEFENDANT:  Okay.  It says Honorable

18   Judge Mihm.  My name is Eric Ingram, and I will be

19   appearing before you for sentencing.

20          Let me start this letter by saying that I

21   accept full responsibility for my conduct.  Being in

22   the Peoria County Jail has given me a chance to

23   reflect on what I have done.  This lack of judgment

24   has always and will have an affect on the person my

25   actions impacted as well as that person's family.

My selfish greed was emotionally and mentally
damaging to her.  All I can do is sincerely
apologize and take full responsibility for my
conduct.  I'm truly and deeply sorry for what I have
done.  I want to apologize directly to this young
girl for what my actions have caused her and the
pain that it has caused her.

A little bit about myself:  When I was a
child, my mother had no love for me, nor did my
father.  The first five years of my life with my
mother, we moved around a lot.  There were always
different men around.  There are times, I recall in
my memory -- and I'm sorry -- me and my sister were
locked in our rooms for hours while mom would be
with her new boyfriend.  I remember times of
physical abuse not only by my father but also my
mother.  Us kids did not matter to our mother then
and we do not now.  I have not had any contact with
my mother in five years.

My father is an alcoholic.  There are many
-- there are many weekends I went to see him when I
was younger.  He was never around.  The time I spent
with his mother, my grandmother, I loved dearly.
When my dad would come around, he was sloppy drunk.
Every time we crossed paths, he was drunk.  The same

1    is true today.

2            He would physically abuse me by kicking me,
3    hitting me on the back of my legs, and throwing --
4    excuse me -- throwing blunt objects and so on.
5    There's always a fear if I said anything about the
6    abuse he would hurt my grandparents as that was
7    threatened.

8            At the age of six, Bill and Jo Ann Brunk
9    took custody of me full time.  They had me the rest
10   of my childhood.  The time with them was loving,
11   caring, supportive and fun.

12           (Pause in proceedings.)

13           (Crying.)

14           THE DEFENDANT:  They raised me to be
15   successful as my own person.  And the actions that I
16   have perpetrated have let them down.

17           The memory of my grandfather -- that I have
18   of my grandfather and I worked countless hours
19   together as a team.  We got to see -- we got to see
20   a veterans memorial featuring an AH-1 Cobra attack
21   chopper.  We traveled to several states and did a
22   lot of activities.

23           In my late teens, I dropped out of high
24   school and obtained a GED.  I worked at a couple of
25   jobs and decided to go to Nashville Auto Diesel

1  College in Nashville, Tennessee.  While in
2  Nashville, my grandfather passed away.  This shocked
3  me to my core.  There was no -- excuse me -- there
4  was no indication that he was in ill health or that
5  there would be any cause of death.  He died from an
6  aortic aneurism.  I quit school.  I came back to
7  Washington to help my grandmother with the household
8  duties.
9        I settled on a career in HVAC.  I worked at
10  DMI and joined Steamfitters 353 in Peoria, Illinois.
11  Over the last four years, I've been setting goals to
12  better myself.  I've set goals to buy my
13  grandmother's home, provide a future home for myself
14  and my five-year-old daughter.
15        My life has been good and it's been -- and
16  it has had some bad.  The best part is being a
17  father.  My relationship with my daughter was always
18  good.  She was with my grandmother and I on the
19  weekends.  Even though I worked a lot, I always made
20  special time to be with her.  One of our favorite
21  things to do was to hike Mill Park with our dog,
22  Max.
23        Being a father and reflecting on my crime, I
24  was able to get a different look at it.  Looking at
25  my mistake and this may contradict me.  If my

1  daughter was in this situation, I would be angered.

2  My actions are not acceptable in any way, shape, or

3  form.

4          While in the Peoria County Jail, I've

5  utilized programs such as Job Partnership.  This has

6  given me new time to plan -- I'm sorry -- to put

7  together a plan for my future.  The outline of that

8  plan is as follows:

9          Upon my release, find gainful employment,

10  live within the terms of my supervised release,

11  engage in a productive hobby, and seek professional

12  counseling.  The counseling that I will be seeking

13  is above and beyond sex treatment therapy because I

14  feel within my life I have several things to talk

15  about and I need to learn and be proactive and find

16  a way to identify past problems and learn to cope

17  with them.  This is a start.

18          In time I would like to own a home, own a

19  successful construction business and become a

20  handyman.  These are goals that I have set since

21  being incarcerated.

22          Upon my release, I would like to have the

23  help of the Court to make sure that I never do this

24  again.  And whatever help can be afforded to me, I'm

25  more than happy to take it.  Thank you.

1          THE COURT:  All right.  Thank you.

2          By the way, before I proceed to sentencing,

3  I think that the probation office had sent to both

4  sides proposed conditions of supervised release.

5          Mr. Schierer, did you have a full

6  opportunity to go over those carefully with your

7  client?

8          MR. SCHIERER:  Yes, Judge, I remember.

9          THE COURT:  Does he have any objection to

10 any of those?

11         MR. SCHIERER:  No, Judge.

12         THE COURT:  Okay.  Do you wish me to read

13 those word-for-word or are you willing to waive

14 reading?

15         MR. SCHIERER:  No, we waive reading.  We

16 went over them.

17         THE COURT:  Is that correct, sir?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Okay.  Miss Legge, any

20 objections?

21         MS. LEGGE: No, Your Honor.

22         THE COURT:  You also waive reading?

23         MS. LEGGE:  I do, Your Honor.

24         THE COURT:  The Court adopts the factual

25 findings and guideline application as contained in

1  the Presentence Report.  There are certain factors
2  I'm supposed to consider in imposing sentence.  The
3  first of those, according to the statute, is the
4  nature and circumstance of the offense, and the
5  nature and characteristics of the defendant.  There
6  has been quite a bit of detail that we've heard
7  through the prosecutor's presentation, I think a
8  fairly comprehensive presentation as to what the
9  criminal conduct consisted of.  I don't think it
10 would serve any particular purpose to go over it in
11 detail again.
12       It begins with paragraph six in the
13 Presentence Report and goes all the way through
14 paragraph 26.  It's kind of a little bit of an
15 unusual way that the facts developed in this case.
16 A lot of the child pornography cases that I have
17 simply involve people getting on the internet and
18 downloading child pornography.  That's not what we
19 are dealing with here.  The defendant had met this
20 young girl, apparently, four, five years before the
21 inappropriate contact started.  They both lived
22 locally in the Washington area.  They started
23 communicating by Facebook, and at this point we have
24 a 29- or 30-year-old man communicating with a
25 15-year-old girl.  So, right off the bat, it's

1  wrong.  It's just wrong.  I'll talk about the
2  defendant's background later but right now focusing
3  on the conduct itself.
4          There was -- the prosecutor made reference
5  to a term of "grooming" which I think did occur
6  here.  This built up over a period of time.  At some
7  point, and this has come up in other cases, but I've
8  always wondered how you cross over this bridge to
9  the point where in this case, as I understand it,
10  the defendant sent to her a video or pictures of him
11  masturbating.  I mean that's a big bridge to go from
12  communicating with someone that you know to becoming
13  this sexually explicit; and then sending videos of a
14  female masturbating to her as a tutorial, and
15  suggesting to her, recommending to her that she do
16  the same and at some point specifically suggesting
17  that she use this hair brush, and according to the
18  transcript of some of the texts, the first time and
19  maybe sometimes following that because of her
20  inexperience, it was a very painful thing for her to
21  try to put that in her vagina, but she did in fact
22  follow his instructions.  And he gave her
23  suggestions that I won't go into detail with here as
24  to how she might make that, be more successful in
25  those efforts.

1          And then you've got the back and forth with
2   her.  At some point she's saying "I don't know about
3   doing this; it's not right."  And it wasn't right.
4   And you knew it wasn't right.  That certainly
5   provided you another opportunity to stop.  But you
6   didn't.
7          There were discussions about meeting her,
8   and you were definitely, the projection here --
9   Mr. Schierer has spoken very eloquently about the
10  difference between doing something with the
11  disconnect of the internet and doing something in
12  person -- but in reading these texts, it's very
13  clear to me that the trajectory of this was to move,
14  a conscious decision on your point, to get her to
15  move from the internet to personal contact; that you
16  were going to provide her with a vibrator; that you
17  were going to meet her, get away from the group that
18  she was with; that you were going to touch her
19  during that, during that time.
20         So, I don't know, I mean, I've been doing
21  this for many years now.  In fact 37 years as of
22  today.  And I'll tell you, candidly, I still don't
23  understand this.  I don't understand this conduct.
24  It's very aggravating because the harm here is very
25  specific.

1          I read letters on the typical pornography
2   cases where the children whose pictures have been
3   spread over the internet, saying, "You know, I'm a
4   victim every time some new person looks at these."
5   That's one type of victimization.  This is another
6   type where it is extremely personal here because you
7   are both local.  You're both from the same area.
8          Looking at your background, there is no
9   doubt you had a tough childhood.  Actually, in
10  reading the Presentence Report, I think, boy, it's
11  amazing, as Mr. Schierer said, that you avoided the
12  criminal system as much as you have.  You have got a
13  couple minor things that I'll mention but -- and
14  there is no doubt in my mind that it's only because
15  of the love and care that was provided to you and is
16  still being provided to you by your grandmother and
17  while he was alive, your grandfather, that you were
18  able to avoid some of these situations.  And you
19  also did receive and still received the support of
20  neighbors, people who have known you over the years.
21  It's -- again, it's one of the things that makes
22  this to me inexplicable.  You had a troubled
23  childhood.  But you also had the unqualified support
24  of your grandparents and other people that helped
25  make you who you became:  an eagle scout, someone

1  with a good work record.

2        So then if we stopped the Presentence Report

3  the day before this was reported, I would say, "Wow,

4  here is a model citizen.  He's made the best of a

5  very bad situation, and we should all give him a

6  round of applause."  And then we go from that to

7  this, to what happened.

8        As I said, you did have -- you had, I think

9  two things in the -- 2010 at the age of 22, you had

10 leaving the scene of an accident.  You collided with

11 another vehicle at a Taco Bell and left the scene.

12 You were located at an apartment.  You admitted

13 doing it.  You got 20 days in jail suspended, two

14 years probation.  And I gather you successfully

15 completed that.  There is no indication to the

16 contrary.

17        And then in 2011 you had a DUI in Tazewell

18 County, convicted, 12 months court supervision, a

19 fine and court costs, community service.  And

20 apparently you were terminated successfully from

21 court supervision.

22        So those are little blips in the road.

23 Again, they don't begin to explain this conduct.

24        It is also interesting, as Miss Legge

25 pointed out the evaluation that was done here, which

1  seems very comprehensive that they didn't find
2  anything that would suggest a foundation for your
3  conduct here.

4        So, the sentence that I impose is intended
5  to reflect the seriousness of the offense, promote
6  respect for the law, provide just punishment, afford
7  adequate deterrence to attachment, to try to
8  discourage attachment from doing the same thing.
9  And it's unfortunate, but it's one of the realities
10  today, that I'm not sure that in terms of deterrence
11  that the public will ever even hear about this.
12  Most of these sentencings are not even covered by
13  the news media.

14        The sentence should also protect the public
15  from further crimes by you.  And that's interesting
16  here because there are certainly major things in
17  your background pointing to the fact that you won't
18  do this again, but because of the inexplicable
19  nature of this conduct, the question remains, you
20  know, this was not simply an impulsive act where you
21  did something one time.  This played out over a
22  pretty substantial period of time and involved a
23  number of separate components each of which provided
24  you an opportunity to stop when you didn't.  So, I
25  still wonder about that.

1       The sentence should also provide you with

2 needed educational or vocational training, medical

3 care or other correctional treatment in the most

4 effective manner.

5       And I might add that there is no ray of

6 sunshine that comes down through the clouds and hits

7 me in the head and gives me some divine idea of what

8 the proper sentence should be.  These sentencings

9 are very difficult, as they should be, in terms of

10 determining what the appropriate sentence should be,

11 because, as Mr. Schierer's pointed out, the sentence

12 imposed by the Court should be sufficient but not

13 greater than necessary to address all of the various

14 sentencing factors.  Excuse me.

15       Taking all of these factors into

16 consideration, the Court finds that the following is

17 the sentence that is sufficient but not greater than

18 necessary to address all of the various sentencing

19 factors:

20       Pursuant to the Sentencing Reform Act, the

21 defendant is hereby committed to the custody of the

22 Bureau of Prisons for a period of 160 months.

23       The Court finds you do not have the ability

24 to pay a fine and no fine is imposed.

25       Following your release from custody, you

 1  shall serve an eight-year term of supervised

 2  release.

 3          While on supervision, you shall not commit

 4  another federal, state, or local crime.

 5          You shall not possess a controlled

 6  substance.

 7          You shall submit to one drug test within 15

 8  days of release and at least two drug tests

 9  thereafter as directed.

10          You shall cooperate in the collection of DNA

11  as directed by the probation office or the Bureau of

12  Prisons.

13          You shall comply with the requirements of

14  the Sex Offender Registration and Notification Act

15  as directed by the probation officer, the Bureau of

16  Prisons, or any state sex offender registration

17  agency in which you reside, work, are a student or

18  were convicted of a qualifying offense.

19          In terms of the conditions of supervision,

20  we've already discussed those and the record is

21  clear that the defendant has been made aware in

22  detail of what the proposed conditions are.  He has

23  discussed those with his client -- with his lawyer;

24  that he has no objection to the specific conditions

25  and waives reading, word-for-word reading of the

1  provisions.  And I might add, separate from that,

2  that I have read each of those conditions and I

3  believe that each of them is appropriate.  I believe

4  that each of them is a necessary component of the

5  tool chest, if you would, for the probation office

6  to work with you while you are under supervision and

7  maximize the hope and the possibility that you will

8  successfully complete your supervision.  So I do

9  impose each of those conditions.

10         A couple of them that I want to focus on:

11         Number seven, you will participate in the

12  Sex Offender Treatment Program as directed.  You

13  will abide by the rule of the treatment provider.

14  You shall submit to physiological testing, including

15  polygraph testing.

16         Also, under number eight, you shall have no

17  contact with any female person under the age of 18,

18  except in the presence of an adult who is aware of

19  the nature of your background and current offense,

20  and who has been approved by the probation office or

21  in the course of normal commercial business or in

22  other cases of unintentional and incidental contact.

23         And number eight, in part, that you would

24  participate with the probation officer's Computer

25  and Internet Monitoring Program during the term of

1  supervision.

2          A special assessment of $200 is imposed and
3  payable immediately.

4          Due to your inability to pay, an assessment
5  under the Justice for Victims of Trafficking Act is
6  not authorized.

7          There is an Agreed Order of restitution in
8  the amount of $3,000.

9          I will recommend that you serve your
10 sentence in a facility as close to your family in
11 Washington, Illinois as possible.  Also, that you
12 serve your sentence in a facility that will allow
13 you to participate in the Sex Offender Management
14 Program and maximize your exposure to educational
15 and vocational opportunities.

16         Can somebody remind me, the camp across the
17 river now, is that female or male?

18         MS. LEGGE:  I believe it's male, Your Honor.

19         THE COURT:  I will recommend that you begin
20 service of your sentence in the minimum security
21 facility across the river.

22         Now because of the length of your sentence,
23 the Bureau of Prisons may not do that to begin with,
24 but there is a medium security facility at the same
25 location.  So if they are not willing to put you in

1  the minimum security, I will recommend that they put

2  you in the medium security to begin with.

3          Was there a waiver in this case?

4          MS. LEGGE: No, Your Honor.

5          THE COURT:  You do of course have the right

6  to file a notice of appeal in this case.  If it is

7  your wish to appeal, I instruct you that any notice

8  of appeal must be filed with the Clerk of the Court

9  within 14 days of today's date.  As your attorney,

10 Mr. Schierer has an absolute responsibility to file

11 that notice for you if that is your wish.  Do you

12 understand?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  Is there anything that I haven't

15 addressed that I need to address?

16         MS. LEGGE: No, Your Honor.

17         MR. SCHIERER:  I don't believe, Your Honor.

18 Thank you.

19         THE COURT:  I will ask the marshals, if you

20 could, give him five minutes or so.

21         If you will turn around in your chair, you

22 can't have physical contact with any of these

23 people, but if you want to talk with him briefly

24 before you leave the courtroom, I will ask that you

25 be allowed to do that.  Thank you.

```
 1          (Which were all of the proceedings held on

 2      this day, 12:13 p.m.)

 3                      *****

 4

 5    I certify that the foregoing is a correct

 6 transcript from the record of proceedings in the

 7 above-entitled matter.

 8

 9

10 s/Nancy Mersot          Date: October 14, 2019

11 Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```