E-FILED
Monday, 10 August, 2020  12:40:17 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, )  ) | |
|         Plaintiff, )  ) | Criminal No. 1:18-10060 |
|     vs. )  ) | |
| ERIC INGRAM, )  ) | |
|         Defendant. ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHAEL M. MIHM
MOTION HEARING
JULY 17, 2020; 10:00 A.M.
PEORIA, ILLINOIS

APPEARANCES:

For the Government:     DOUGLAS F. McMEYER, ESQUIRE
                        Asst. United States Attorney
                        211 Fulton Street, Suite 400
                        Peoria, Illinois 61602
                        (309) 671-7050

For the Defendant:      ROBERT A. ALVARADO, ESQUIRE
                        Federal Public Defender
                        401 Main Street, Suite 1500
                        Peoria, Illinois 61602
                        (309) 671-7891

Jennifer E. Johnson, CSR, RMR, CRR
U.S. District Court Reporter
Central District of Illinois

Proceedings recorded by mechanical stenography;
transcript produced by computer

1    THE CLERK:  Okay.  I have Judge Mihm on the

2  line.  I'm going to take a quick roll call for him.

3    Doug McMeyer?

4    MR. McMEYER:  I'm here.

5    THE CLERK:  Rob Alvarado?

6    MR. ALVARADO:  Yes, I'm here.

7    THE CLERK:  Probation Officer Alec Gerdes?

8    PROBATION:  Here.

9    THE CLERK:  Defendant Eric Ingram?

10    THE DEFENDANT:  Here.

11    THE CLERK:  And court reporter, Ms. Johnson?

12    COURT REPORTER:  Here.

13    THE CLERK:  Your Honor, everyone's on the

14  line.

15    THE COURT:  All right.  Thank you.  And good

16  morning to everyone.

17    We're here to consider arguments on

18  Defendant's amended motion for compassionate

19  release.  I've read all the filings that have

20  occurred here.  As you know, my practice is first

21  to discuss the issue of exhaustion, conditions at

22  the prison, the defendant's conduct, whether he's a

23  danger to the community, and the release plan.

24    How old is the defendant at this point?

25    MR. ALVARADO:  Your Honor, let me check his

1   age.

2       THE COURT:  Mr. Ingram -- I can ask -- how old

3   are you, sir?

4       THE DEFENDANT:  32, sir.

5       THE COURT:  Thank you.

6       Okay.  And as I understand it, the original

7   sentence was on 8/20 of '19.  The sentence was 160

8   months.  At this point, his release date is 2/13 of

9   '30.

10      So, let's talk first about exhaustion.

11  Mr. McMeyer, are you disputing the adequacy of

12  exhaustion in this case?

13      MR. McMEYER:  Your Honor, yes, we are.  In

14  this particular instance, it appears that

15  Mr. Ingram filed his pro se motion two days before

16  he even received a response from the warden.  He's

17  failed to meet his burden in the fact that he

18  hasn't provided documentation to even show what was

19  submitted to the warden or when it was submitted.

20      And the government would note that, assuming

21  that his response from the warden was somewhat

22  proximate to whatever request he posed, that would

23  not run the 30 days which would be his burden to

24  establish.

25      Moreover, as the government has noted, it's

1  not simply sufficient to receive a negative answer;

2  rather, during that 30-day period, the defendant

3  must exhaust all administrative remedies, which

4  includes appeals, and there's no evidence provided

5  by the defendant that that standard has been met.

6      So, the government does not believe he has

7  exhausted.

8      THE COURT:  Does the warden's letter indicate

9  that he had made a request for release because of

10  the virus?

11      MR. McMEYER:  I don't recall.  If you'll bear

12  with me just a moment, I believe it was one of the

13  exhibits to our --

14      THE COURT:  Yes, I think it is.

15      MR. McMEYER:  I believe it's Exhibit 3, Your

16  Honor.  And it does mention COVID, but doesn't

17  suggest -- the warden's response does mention

18  COVID, but it does not -- it's not clear what, what

19  the argument presented by the defendant was.

20      THE COURT:  Okay.  Mr. Alvarado, I've had a

21  number of these hearings now, and I think I've bent

22  over a little bit backwards on this matter of

23  exhaustion, but this, this looks a little bit

24  problematic here.

25      MR. ALVARADO:  Your Honor, he did file a

1   proper motion or a request with the warden

2   requesting compassionate release.

3        THE COURT:  Excuse me.  When did he do that?

4        MR. ALVARADO:  I don't have the exact date at

5   my fingertips when he did it, but it was -- the

6   denial was on June 4th.  Now, it's true that he

7   filed his petition with this Court prior to that, a

8   couple of days prior to that.  I don't think that

9   that should be determinative of the Court even

10  considering this request.  I think he substantially

11  complied with the requirements in the statute to

12  exhaust administrative remedies.

13       THE COURT:  Well, do we have any documentation

14  on what he said to the warden?

15       MR. ALVARADO:  I believe that he initially

16  filed one request where he did not use the words

17  "compassionate release," but then a subsequent

18  request did use those terms, and it's clear from

19  the warden's denial that he was considering it

20  along those terms.

21       I, I do know that -- well, there are courts

22  that have held that this is essentially a

23  claim-processing rule and that the Court can

24  overlook any of the -- any missing details of a

25  claim or the warden's response or the lack of

1  response, and I would ask the Court to overlook any

2  defects in this request.

3      THE COURT:  Well, I'm going to -- I'm going to

4  do exactly that, but I'm troubled by this and -- I

5  don't know.  The problem is that the record I have

6  now does not indicate what he said to the warden.

7  He also did not file any appeal from that; is that

8  correct?

9      MR. ALVARADO:  Now, that's true.  He did not.

10      THE COURT:  Yes.  All right.  Well, I think

11  Mr. McMeyer has a very strong argument here, but

12  I'm going to find that in terms of the claims

13  process, which I think is the most legitimate test

14  to apply here, I think he minimally meets that, so

15  we'll go ahead and consider the merits.

16      The prison, he's in FMC Rochester, correct?

17      MR. ALVARADO:  Correct.

18      THE COURT:  I would think that would be about

19  the safest place to be in the whole country, in

20  B.O.P. --

21      MR. ALVARADO:  Well, that --

22      THE COURT:  -- because he's right next to the

23  Mayo Clinic.

24      MR. ALVARADO:  Oh, that is absolutely correct,

25  Judge, and I did discuss that with Mr. Ingram, but

1  I just want to point out one example of why that is

2  not -- does not assure that FMC Rochester is going

3  to be COVID-19-free in the future.

4      I filed a claim in another case that's pending

5  in front of Judge Shadid on May 26th for FCI Jesup,

6  which is in Georgia.  On May 26th, there were no

7  cases of COVID-19 among the inmates or the staff.

8  They didn't even have any in the past.  And as of

9  yesterday, I believe there were 113 inmates that

10  tested positive.  So, in a little over a month and

11  a half, they went from zero to over 100 cases of

12  positive inmates, and I believe there were staff

13  members as well that have tested positive.

14      So, today's safe institution can be tomorrow's

15  hot spot in a matter of days.

16      THE COURT:  Is it -- is it still correct,

17  Mr. McMeyer, that right now there are zero inmate

18  cases and one staff member recovered?

19      MR. McMEYER:  As of this morning, that's

20  correct, Your Honor.  And when I say "this

21  morning," that's probably -- I believe the data

22  gets updated at -- I believe it's 3:00 Eastern.

23  So, that would be as of 3:00 Eastern yesterday,

24  there are no cases at FMC Rochester, only one

25  recovered staff.

1        THE COURT:  All right.  Let's talk about his

2   health situation.  He has some sort of an

3   autoimmune problem?

4        MR. ALVARADO:  Yes, sir.  It's a bleeding

5   disorder called ITP.  I don't claim to be a doctor.

6   I guess since these compassionate release

7   petitions, I've had to educate myself on lots of

8   medical conditions and how they relate to COVID-19.

9   But it's a bleeding disorder, and it's not listed

10  presently as one of the CDC list of illnesses or

11  symptoms that would make one susceptible to

12  COVID-19, but what, what the doctors seem to say is

13  that if someone with ITP does test positive for

14  COVID-19, if they receive a secondary infection, a

15  bacterial infection, that that could complicate

16  their health.

17       THE COURT:  Okay.  Do I understand correctly

18  that he's not receiving any medical treatment now?

19       MR. ALVARADO:  Correct.  They're monitoring

20  the situation, and --

21       THE COURT:  Right.

22       MR. ALVARADO:  -- and if he has any sort of

23  bumps or bleeds that it could quickly escalate into

24  a serious situation.  But because it's a --

25       THE COURT:  I'm sorry.  Go ahead.

1      MR. ALVARADO:  But because it's an autoimmune
2   disorder, there is no cure for it.
3      THE COURT:  No, but there are treatments, if
4   necessary, as I understand it.
5      MR. ALVARADO:  Yes.  There are.
6      THE COURT:  So, as I understand it, he's
7   presently cleared to work without restrictions; is
8   that right?
9      MR. ALVARADO:  That is correct.  He's an HVAC
10   technician.  He was before he went to prison, and
11   he's working in that capacity in the prison now,
12   which I believe would place him at a higher risk
13   because he is working with the ventilation systems,
14   and, as we know, COVID-19 spreads very easily
15   through ventilation systems.  That's how it
16   spreads.
17      THE COURT:  Mr. McMeyer, do you have any
18   comment on his medical condition?
19      MR. McMEYER:  Your Honor, I would just
20   reiterate what is presented in the government's
21   response, which is that the platelet disorders
22   organization that was cited by the defendant in his
23   motion to the Court specifically says that
24   individuals, even those who -- with this disease,
25   even those who have had a splenectomy are not

predisposed to getting the COVID-19 virus.  And
those words, "not predisposed to getting the
COVID-19 virus," are a direct quotation from that
website.

THE COURT:  Let me stop you there.  Hold on a
second.  You say they're not predisposed, but I
thought the concern about diabetes and bronchitis
and certain other things that are on that list was
not that they were predisposed to getting the
virus, but if they got it that the chances are that
they get a lot sicker and have a higher risk of
dying.

MR. McMEYER:  Your Honor may -- you may be
exceeding my knowledge on, on those issues.  I know
that the CDC has not listed bleeding disorders such
as this as being something which significantly
increases the risk of a negative case, and I
believe the PDSA states that there's not an
increased risk as well.  Aside from the
predisposition, there is other language on there
that suggests that they have -- well, here it is
right here:  Quote, very little to no added risk
for ITP patients being infected by COVID-19,
unquote.

THE COURT:  Okay.

1      MR. McMEYER:  So, there may be some increased

2  risk of a secondary infection, as Mr. Alvarado has

3  noted, but, you know, I -- I'm not a doctor, and I

4  don't try to play one in the courtroom either so I

5  -- what I've seen from the website and from the CDC

6  is that his medical condition is not one that has

7  been identified as significantly exacerbating the

8  risk of COVID-19.

9      THE COURT:  Okay.  Thank you.

10     Mr. Alvarado, let's talk about his conduct in

11  prison.

12     MR. ALVARADO:  Well, he has clear conduct.  He

13  has no violations since he's been in prison.

14     He did take a -- he had a sex offender

15  evaluation before sentencing in this case and that

16  found him to be a low to moderate risk to

17  re-offend.

18     I think by all accounts he's a model inmate,

19  and that certainly is consistent with someone who

20  didn't have a prior criminal history and didn't

21  have any history of any type of sex offense or any

22  type of inappropriate conduct with anyone prior to

23  the federal case.

24     THE COURT:  Okay.  Mr. McMeyer, do you have

25  any reason to dispute that?

 1       MR. McMEYER:  No, Your Honor, I don't.  Yeah.

 2  I don't.  I do not.

 3       THE COURT:  Okay.  Mr. Alvarado, please

 4  address the issue of whether he's a danger to the

 5  community.

 6       MR. ALVARADO:  Well, part of what I just said

 7  shows that he, he is a lower risk of danger to the

 8  community than the average inmate.  I do think that

 9  the supervised release period would assure or could

10  assure the safety of the community.

11       He's going to have sex offender treatment.

12  It's going to include polygraph requirements.  He's

13  going to be closely monitored by a probation

14  officer.

15       He's got a good release plan that he's thought

16  through.  He's got a good place to go.  He's got

17  job opportunities and --

18       THE COURT:  Well, let me interrupt you for a

19  minute.  You said he has a good release plan, but

20  if I read the -- if I read the probation officer's

21  memo correctly, there were three possible places;

22  one had a minor daughter, one had an 11-year-old,

23  and one had a 9-year-old and was 492 feet from a

24  high school.

25       MR. ALVARADO:  The first place and the place

that he does intend to release to, it's a cousin of his who he considers his aunt.  The daughter is a high schooler, and she is going to be moving to another town so she can attend her last year of high school, and so she would not be in the home.

THE COURT:  Okay.  I understand.

MR. ALVARADO:  The other two were problematic, but they do show that Mr. Ingram is really trying to comply with the requirements of the statute to come up with a good release plan.

You've seen many cases, I'm sure, Your Honor, where inmates have no idea where they're going to go when they get out of prison and no idea about what they're going to do.  That's not Mr. Ingram.

THE COURT:  Okay.  Thank you.

Mr. McMeyer, would you comment on the danger to the community and the release plan?

MR. McMEYER:  Thank you, Judge.  And I would like to comment on the 3553 factors more broadly than just danger to the community if that's okay with the Court.

THE COURT:  Sure.  Go ahead.

MR. McMEYER:  In terms of danger to the community, you know, Mr. Ingram, his behavior was deplorable.  It, it involved not simply the receipt

1    of child pornography but the actual solicitation of

2    it and the solicitation of it in the context of the

3    fact that the young woman in question indicated

4    that what Mr. Ingram was requiring her to do was

5    painful to her, and she -- he indicated that she

6    needed to continue it.

7        I recognize that there's been a sex offender

8    evaluation that put him at a low to moderate risk

9    of recidivism, but when we weigh the other 3553

10   factors, to release a man who engaged in the

11   behavior that he did with more than -- almost ten

12   years left on his sentence is simply not acceptable

13   in the government's eyes.

14       His health conditions were known at the time

15   of his conviction and at the time of his

16   sentencing, and, therefore, the only new factor is

17   not his health condition but the health condition

18   combined with COVID, and, candidly, I just don't

19   believe that COVID itself changes the 3553 factors

20   that this Court has already analyzed in imposing

21   the sentence that it did.

22       It may have been his first recorded offense

23   with -- in terms of his criminal history, but we

24   also know the nature of sexual offenses like this;

25   there are often many more offenses that are not

1  charged or not even discovered.  Specifically, I
2  believe it's something along the nature of eight to
3  ten victims per sex offender before there's ever
4  anything that comes about.
5      So, I just simply do not believe the 3553
6  factors allow for his release.
7      More broadly, with respect to his release
8  plan, the Court's correct there were three release
9  plans, but all three of them involve minor
10  children.  And the first one, the one that
11  Mr. Alvarado just addressed, there does appear to
12  be an indication that the minor daughter would be
13  leaving the house in order to attend her last year
14  of high school, but the person she would be living
15  with is the person identified in the second release
16  plan.  And so what we have between those first two
17  release plans is essentially a minor child being
18  ping-ponged back and forth between two people.  And
19  what that doesn't take into account, Your Honor, is
20  that even if she is living with one person or the
21  other, she still has a relationship with her mother
22  or her aunt and would likely visit them or be
23  present at the house or come by to visit them, and
24  those are all problematic with respect to the
25  restrictions that will be placed on Mr. Ingram.

1    And so the release plans at this point are

2  simply not appropriate, and I think they put a

3  undue burden on this minor child, whether it be the

4  one who is sort of being shuffled back and forth

5  between release plan one and release plan two, or

6  the child is involved in the third release plan

7  that also is proximate to the school.  So, I don't

8  believe the release plans are appropriate,

9  particularly in light of the defendant's sex

10  offender status.

11    THE COURT:  Okay.  Mr. Alvarado, do you have

12  any final points you want to make?

13    MR. ALVARADO:  Right.  I don't think we need

14  to be distracted by the second and third release

15  plans.  The first release plan is the one that

16  Mr. Ingram really wants to be released to.  The

17  girl is not being shuttled back and forth against

18  her will.  From my understanding, she wants to

19  attend her final year of high school at the other

20  school, so it's not a hardship on her.

21    And Mr. Ingram's cousin, the third-party

22  custodian, is well aware of his conviction, what he

23  had done, and she is fully cooperative with

24  Probation on that point.

25    As far as the 3553(a) factors, I would just

merely point out that the offense conduct in this
case was a relatively short duration.  It was
approximately a couple of months, if I recall
correctly, and there was no evidence that he had
any other child pornography in his possession other
than with this one minor girl.  And there was no
evidence that he intended to traffic in child
pornography, and as we -- as I've already said, he
has no history of anything like this.

The one thing I also neglected to say about
the danger to the community is that he would be
required to register as a sex offender, so he would
be -- the community would be protected by that very
fact as well.  So, I think that under all the
circumstances he would be suitable for release.

I do recognize that he has a long time left to
serve on his sentence, and I merely point out that
the government could have charged this in a
different way, and the guidelines could have been
lower had they not applied a cross-reference for
essentially production of child pornography to make
this sentence within the -- or at least the
guideline range.  It could have made the guideline
range significantly lower.

THE COURT:  Well, he did produce child

1  pornography, didn't he?

2      MR. ALVARADO:  He did, but we could also have

3  said that he solicited an image of child

4  pornography which would have been a different

5  guideline range.

6      THE COURT:  Okay.  I understand your point.

7      MR. ALVARADO:  Okay.  Well, that -- that's

8  all.

9      THE COURT:  All right.

10      MR. ALVARADO:  That's all.

11      THE COURT:  Mr. McMeyer, do you have any final

12  comment?

13      MR. McMEYER:  No, Your Honor.  I think I've

14  said everything that needs to be said in this

15  instance.

16      THE COURT:  All right.  Well, thanks to both

17  sides for the quality of your argument.

18      My ruling is I'm going to deny the motion for

19  compassionate release.

20      First of all, he's 32 years old which is

21  nowhere near the 65 years that creates the more

22  problematic situation.

23      He's at Rochester which I still say is one of

24  the safest places in the country to be at this

25  point.  Mr. Alvarado is certainly correct, any

1   institution could have an explosion of these cases,
2   but it hasn't happened at Rochester, and the Mayo
3   Clinic is right there.
4       I began by saying I was going to excuse the --
5   or get around the exhaustion part of this, and I
6   do.
7       His health condition, he does have a health
8   problem.  He's not presently being treated for it.
9   This is not identified as a specific risk regarding
10  the virus, and he's cleared to work without
11  restriction.  So, I think that goes against his
12  release.
13      His conduct in prison has been exemplary.  No,
14  no negatives on that.
15      I do think he's a danger to the community.  He
16  still has, by far, the majority of his sentence to
17  serve, about ten years, and this was an aggravated
18  case.  I guess you can argue that every one of them
19  is, but in this situation, he did, in fact, solicit
20  and create child pornography, create it under
21  difficult circumstances for the victim.
22      The release plan itself, I guess the first
23  alternative would probably be workable.  I gather,
24  based on what was presented, that the girl does
25  want to go to this other school.  The mother could

1  visit her daughter somewhere else other than in

2  that home, so I think that part of it is workable.

3      But taking all of this stuff together, I don't

4  believe that there's any compelling or

5  extraordinary reason to allow this defendant to be

6  released from prison at this time.  So, with all

7  due respect, I'm going to deny the amended motion

8  for compassionate release.

9      Anything else?

10     MR. ALVARADO:  Nothing else, Judge.  Thank

11  you.

12     MR. McMEYER:  Not from the government, Your

13  Honor.

14     THE COURT:  Okay.  Thank you very much.  Have

15  a nice day.

16      (Proceedings concluded at 10:28 a.m.)

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE OF OFFICIAL REPORTER</u>


        I, Jennifer E. Johnson, CSR, RMR, CBC, CRR, in and for the United States District Court for the Central District of Illinois, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

        Dated this 10th day of August, 2020.



                        <u>/s/ Jennifer E. Johnson</u>
                        JENNIFER E. JOHNSON
                        CSR, RMR, CBC, CRR
                        License #084-003039